# APPENDIX

# INDEX TO APPENDIX

Documents — Page

Initial Decision, Morgan v. Dep't of Transp.,
MSPB No. SF-0752-06-0090-I-1, dated July 14, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Final Decision, Morgan v. Dep't of Transp.,
MSPB No. SF-0752-06-0090-I-1, dated March 22, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . 36

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**WESTERN REGIONAL OFFICE**

| | |
|---|---|
| GREG A. MORGAN,<br>Appellant, | DOCKET NUMBER<br>SF-0752-06-0090-I-1 |
| v. | |
| DEPARTMENT OF<br>TRANSPORTATION,<br>Agency. | DATE: July 14, 2006 |

Greg A. Morgan, Lancaster, California, pro se.

Lisa J. Toscano, Esquire, Los Angeles, California, for the agency.

**BEFORE**
Gerard C. Dasey
Administrative Judge

## INITIAL DECISION

## INTRODUCTION

On October 31, 2005. the appellant timely appealed the action of the agency removing him from the position of Air Traffic Control Specialist, AT-2152-HH, effective September 30, 2005. Initial Appeal File (IAF), Tab 1 and Tab 5, Subtab 4 (Standard Form 50). The Board has jurisdiction over this appeal pursuant to 49 U.S.C. § 40122(g)(3). The appellant withdrew his request for a hearing and this case was decided on the written submissions of the parties.[1] For the reasons discussed below, the agency's action is AFFIRMED.

---

[1] By an Order Closing the Record dated February 7, 2006, the parties were informed that they could submit additional evidence and argument to be received by the Board no

## ANALYSIS AND FINDINGS

Burdens of Proof and Applicable Law

To sustain an adverse action before the Board, an agency must prove, by a preponderance[2] of the evidence, the factual basis for the misconduct charged and establish that disciplinary action, based on the proven misconduct, promotes the efficiency of the service. *See* 5 U.S.C. §§ 7513(a) and 7701(c)(1)(B). The "efficiency of the service" requirement includes a showing that some disciplinary action is warranted (the "nexus" requirement) and that the particular penalty is within the tolerable limits of reasonableness. Thus, three distinct elements must be proven in any adverse action. *See, e.g., Pope v. U.S. Postal Service,* 114 F.3d 1144, 1147 (Fed. Cir. 1997); *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 306-07 (1981). In reviewing an agency-imposed penalty, the Board must give due weight to the agency's primary discretion in maintaining employee discipline and efficiency, recognizing that the Board's function is not to displace management's responsibility but to insure that management discretion has been properly exercised. *See, e.g., Brown v. Department of the Treasury*, 91 M.S.P.R. 60 (2002).

---

later than February 14, 2006. IAF, Tab 26. They were also afforded the opportunity to submit a rebuttal to the opposing party's submission, to be received by the Board no later than February 17, 2006. The parties were informed that no evidence or argument received after February 17, 2006, would be "accepted unless accompanied by information showing that it is new and material evidence" that was not available before the record closed on February 17, 2006. *Id.* On February 21, 2006, the appellant submitted a pleading entitled Appellant's Response to the Agency's Motion to Strike. IAF, Tab 44. On February 23, 2006, the agency submitted a pleading entitled Request. IAF, Tab 45. Neither of these untimely pleadings met the "new and material evidence" standard included in the Order Closing the Record, and I have not considered either pleading in making this decision.

[2] A preponderance of the evidence is that amount of relevant evidence which a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely true than untrue. 5 C.F.R. § 1201.56(c)(2).

In deciding whether statements constitute threats, the Board is to apply the reasonable person standard, considering the listener's reactions and apprehension of harm, the speaker's intent, any conditional nature of the statements, and the attendant circumstances. *Metz v. Department of the Treasury*, 780 F.2d 1001, 1002 (Fed. Cir. 1986). In considering these factors, the Board must "give objective evidence heavy weight." *Id.* at 1003. Whether an employee intends to carry out a threat is irrelevant to whether an employee intends to make a threat. *Greenough v. Department of the Army*, 73 M.S.P.R. 648, 652 (1997). Before considering whether an actionable threat has been made, the Board must determine the actual words used by the appellant to convey the alleged threat. *Larry v. Department of Justice,* 76 M.S.P.R. 348, 356 (1997).

To prove harmful procedural error, the appellant must establish that the agency committed an error in the application of its procedures that is likely to have caused it to reach a conclusion different from the one it would have reached in the absence or cure of the error. *See* 5 U.S.C. § 7701(c)(2)(A); 5 C.F.R. § 1201.56(c)(3). The burden is upon the appellant to show that the agency committed an error and that the error was harmful, *i.e.*, that it caused substantial prejudice to his rights. *Stephen v. Department of the Air Force*, 47 M.S.P.R. 672, 681, 685 (1991).

In determining whether reprisal for whistleblowing activities occurred, an inquiry must be made into whether: The appellant made a disclosure protected under 5 U.S.C. § 2302(b)(8),[3] the disclosure was a contributing factor in the agency's personnel action; and the agency can prove by clear and convincing

[3] To establish that the appellant had a reasonable belief that a disclosure met the criteria of 5 U.S.C. § 2302(b)(8), he need not prove that the condition disclosed actually established a regulatory violation or any of the other situations detailed under 5 U.S.C. § 2302(b)(8)(A)(ii); rather, the appellant must show that the matter disclosed was one which a reasonable person in his position would believe evidenced any of the situations specified in 5 U.S.C. § 2302(b)(8). *Garst v. Department of the Army*, 60 M.S.P.R. 514, 518 (1994).

evidence that it would have taken the same personnel action in the absence of the disclosure. *Clark v. Department of the Army*, 997 F.2d 1466, 1470 (Fed. Cir. 1993), *cert. denied,* 510 U.S. 1091 (1994). An employee may demonstrate that a disclosure was a contributing factor in a personnel action through circumstantial evidence, such as evidence that the official taking the personnel action knew of the disclosure,[4] and that the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action. *Scott v. Department of Justice*, 69 M.S.P.R. 211, 238 (1995), *aff'd*, 99 F.3d 1160 (Fed. Cir. 1996) (Table). In determining whether an agency has shown by clear and convincing evidence that it would have taken the same personnel action in the absence of whistleblowing, the Board will consider the following factors: the strength of the agency's evidence in support of its action; the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated. *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999).

Background

Prior to the removal action at issue in this appeal, the appellant was assigned to the agency's High Desert Terminal Radar Approach Control (TRACON) facility at Edwards Air Force Base (AFB) in California. IAF, Tab 5, Subtab 4 (Standard Form 50). At the time of his removal, the appellant had over twenty-four years of Federal service. *Id.*, block 31. His primary duties as an Air Traffic Control Specialist (ATCS) included controlling the movement of aircraft within his assigned sectors or units of airspace, using radar to maintain required

[4] The legislative history of the Whistleblower Protection Act allows for the possibility that agency officials may be held culpable where they had only constructive knowledge of a protected disclosure. *McClellan v. Department of Defense*, 53 M.S.P.R. 139, 146-47 (1992).

separation between aircraft, and coordinating radar handoffs to other controllers, towers and centers. *Id.*, Subtab 4n at 2.

On July 27, 2005, Mark Heinrich, Air Traffic Manager at High Desert TRACON, proposed to remove the appellant on charges of (1) "Making an indirect threat" (one specification), and (2) "Working beyond shift without authorization to do so and then claiming it as overtime"(one specification). *Id.*, Subtab 4a. After the appellant responded to the proposal, *id.*, Subtab 4b, Mr. Heinrich issued a decision sustaining both charges and finding that removal was the appropriate penalty. *Id.*, Subtab 4e. This appeal followed.

Charge One: Making an indirect threat

In order to prove this charge, the agency must prove that the appellant made a statement that was a threat within the meaning of the *Metz* criteria.[5] In support of the charge, the agency submitted three documents signed by Roy K. Awana, the only other person present when the appellant allegedly threatened to kill another agency employee. The first of these documents was a memorandum written by Mr. Awana on February 25, 2005. The memorandum was addressed to "Kenyatta, FAA Administrator's Hotline." IAF, Tab 5, Subtab 4f at 16-17. Mr. Awana described the memorandum as a "report of the incident" that he told Kenyatta about that morning. Mr. Awana identified himself as an ATCS at High Desert TRACON and vice president of the NATCA[6] Local. Mr. Awana wrote:

> The reason I called this morning was to report that one of my co-workers, Greg Morgan, threatened to kill another co-worker, Frank Ceruti.

---

[5] I understand the word "indirect" in the charge to mean that the threat was not communicated directly by the appellant to the target of the threat; rather it was communicated to a third party. All evidence in the record shows that the agency and the appellant had this same understanding.

[6] The National Air Traffic Controllers Association is the union that represents ATCSs at High Desert TRACON and other agency facilities. IAF, Tab 5, Subtab 4s (collective bargaining agreement).

He described a sequence of events on the morning of Tuesday, February 22, 2005. When Mr. Awana signed in for duty at 10:15 a.m., he found a greeting card that had been circulated for a secretary who was resigning from the agency. He saw inside the card a note that said, "GOOD RIDDANCE AND MAY YOU BURN IN HELL." The note was signed "PG," the work initials used by the appellant. *Id.*

After he signed in, Mr. Awana was told by his supervisor that he had been asked to represent the union at a meeting called by Frank Contatore, a team supervisor, "to investigate a matter that [the appellant] was involved in and to give [the appellant] a Letter of Proposed Discipline in another matter that he was involved in." Mr. Awana and the appellant attended the meeting, which lasted for approximately fifteen to twenty minutes. After the meeting, they went to the union office, where the appellant showed Mr. Awana the notice of proposed five-day suspension he had received during the meeting. As Mr. Awana read the notice, the appellant said, "Now I'm going to have to work with that fucking Frank on this." The appellant then said, "I'm going to kill him." *Id.*

Mr. Awana wrote that the appellant "said this with such intensity" that it "bothered" Mr. Awana. He explained that Frank Ceruti had just defeated the appellant in an election for President of the NATCA Local the previous Friday, February 18, 2005, and there had been "a lot of 'bad blood' between [the appellant] and Frank Ceruti in the past few years." The appellant said management waited until Frank got elected and said something to the effect that "they were all in this together and they were all out to get him." Mr. Awana told the appellant "to watch what he said because he was very upset, and that he needed to relax." As he left the union office, the appellant "said there's going to be a lot happening around here." He also said, "Maybe I'll file a lawsuit" and "I'm not feeling too well right now." *Id.*

After the appellant left, Mr. Awana wrote up a record of conversation on the meeting he had attended with Mr. Contatore and the appellant, and went back to work. Enroute to his work station he heard another employee telling Reatha

Awana, his wife, who also worked at High Desert TRACON, that she should not have confronted the appellant about his message on the greeting card because "he was very angry." Mr. Awana was told that his wife had said to the appellant that he should not have written his message on the card; he responded that it was none of her business. Mr. Awana was also told that the appellant had left work on sick leave. *Id.*

After working for forty-five minutes, Mr. Awana tried to call Frank Ceruti and Alan Staabs, the outgoing union local president, to inform them of the appellant's statement about killing Mr. Ceruti. When he couldn't reach them, he went and "told the story" to Mr. Heinrich. Mr. Heinrich told Mr. Awana that he would report the incident to "the Regional Office." Because he had not contacted Mr. Ceruti or Mr. Staabs, and because he "had not heard back from the Region by the end of the day," Mr. Awana called Bob Marks, the NATCA Regional Vice President for the Western Region. Mr. Marks told Mr. Awana that he agreed that the appellant "may be a Security Risk" and that Mr. Marks would "make a follow-up phone call to make sure that they got the information." Mr. Marks later told Mr. Awana that the appellant's security clearance was suspended and he would be "on leave pending an investigation." *Id.*

Mr. Awana wrote that he had been told on February 24, 2005, that the agency's Civil Aviation Security Division advised Mr. Heinrich that "although they agreed that this kind of threat is a criminal offense, there was nothing they could do" and Mr. Awana would have to go to "the local authorities" and file a complaint. Mr. Awana wrote that he did not "agree with this entirely." He opined that "this is an FAA matter and should be handled by the FAA." Mr. Awana noted that the appellant had been arrested trying to bring a firearm onto Edwards AFB, and was confrontational with management. Finally, he wrote:

> I hope that the constant anger that he displays is enough substantiation to indicate that Frank Ceruti could possibly be in danger, and I could also be in danger once [the appellant] finds out that I reported him for what he said. I am asking for some guidance

> in this matter as soon as possible and recommend highly that someone in the FAA conduct an investigation.

*Id.*

The second document from by Mr. Awana was a sworn statement he signed on March 3, 2005, in the presence of Bobby White, a Special Agent of the Federal Aviation Administration (FAA). *Id.* at 19-20. In this statement, Mr. Awana recounted the events of February 22, 2005, including the alleged threat by the appellant:

> As we discussed this matter after the meeting, [the appellant] became very angry and stated to me, "now I've got to deal with that fucking Frank on this." [The appellant] again, in his next statement, in a very forceful manner was: "I'm going to kill him." At that time I didn't know if [the appellant] was serious about killing Frank, but I believe that he is capable of committing an act like that, or at least causing him some harm. [The appellant] in my opinion is a bully and he is very hostile to some of his co-workers and others at this facility. [The appellant] is a very intimidating person and I believe that he is irrational and can pose a threat if he thinks it is called for.

*Id.*

According to Mr. Awana, the appellant also said that "a lot of shit is going to happen around here." Mr. Awana opined that "this was some kind of threat" but he did not know to whom this statement was directed. Mr. Awana addressed his own apprehension:

> I am concerned for my safety. I am a former law enforcement officer in Georgia and because of my experience with people exhibiting this kind of behavior, I do believe that [the appellant] is capable of carrying out any of his threats. I am now in the process of purchasing a firearm to protect me and my family from any of these threats made by [the appellant].
>
> I am aware that [the appellant] has and may carry firearms and that is one of my concerns. I am very concerned that [the appellant] could bring a firearm into this facility. I know of an incident that [the appellant] was stopped at the Edwards Security Gate a couple years ago and that a firearm was found in his vehicle during a random search.

> I know [the appellant] is anti-government and he challenges authority at any chance he gets. I believe that he could be a threat to government officials when he believes it is necessary or when he feels threatened by them.

*Id.*

The third document from Mr. Awana is a declaration under penalty of perjury signed on February 11, 2006. IAF, Tab 28. In this document, Mr. Awana again described the events of February 22, 2005, and again stated under oath that the appellant had said that he would kill Mr. Ceruti:

> [The appellant] said, "Now I'm going to have to work with that fucking Frank on this," and then he said, "I'm going to kill him!"

*Id.* Mr. Awana noted that in writing the above, he was quoting from his Hotline complaint of February 25, 2005. He added the following:

> When [the appellant] made the statement that he is going to kill Frank, the words came from his whole being; the words came out like a roar. Furthermore, Frank Ceruti was never a subject or topic of discussion during the investigatory meeting and so when [the appellant] made the threat to kill Frank Ceruti, I was stunned – there was no rational connection. As [the appellant] left the union office he said that there's going to be a lot happening around here.

*Id.*

Mr. Awana stated that after the appellant left the union office, Mr. Awana "began evaluating [the appellant's] threat in context" using a "Red Flag Behaviors" pamphlet. Mr. Awana's assessment was that the appellant "met eight of the red flag behaviors." He also "became quite anxious" when he realized that the appellant "could turn his irrational anger" towards Mr. Awana when he learned that Mr. Awana had "turned him in." Mr. Awana described his mental state after hearing and reporting the statements made by the appellant:

> For a full week after [the appellant] made his threat on Mr. Ceruti's life, my life was filled with tension and worry. For every noise outside my home my wife and I would become anxious and would check it out. I was finally able to reach Mr. Ceruti on February 27, 2005, to inform him of the threat. I advised Mr. Ceruti to be careful.

*Id.*

Attached to Mr. Awana's declaration is a copy of a two-page pamphlet entitled Red Flag Behaviors, apparently produced by a regional agency component. Mr. Awana stated in his declaration that he had underlined the eight behaviors he believed applicable to the appellant on his copy of the pamphlet. The behaviors underlined are:

> Threats to harm themselves or others
>
> Any history of violent behavior
>
> Self-pity, talking continually about the abuse one is really or allegedly suffering at the hands of others
>
> Open hostility or hatred of fellow employees
>
> Any bizarre behavior that deviates substantially from the norm
>
> Intimidation
>
> Stress from any cause, such as discipline/conduct/removal, divorce, death in the family

After evaluating the appellant's statements, Mr. Awana reported them first to Operations Supervisor Paul Swanson, and then to Mr. Heinrich. Because he was "frustrated with the lack of action by FAA regarding [the appellant's] threat, Mr. Awana contacted Kenyatta of the FAA Administrator's Hotline. She asked him to put his complaint in writing. In response, he wrote his memorandum of February 25, 2005, and faxed it to Kenyatta. *Id.*

After being interviewed by Special Agent White, the appellant signed a sworn statement regarding the alleged threat on May 18, 2005. IAF, Tab 5, Subtab 4f at 37-38. The appellant acknowledged that he met with Mr. Awana "on or about" February 22, 2005, to discuss a proposed disciplinary action for "an alleged operational deviation." The appellant stated that he was "somewhat concerned" because Mr. Awana had been "instrumental in providing FAA with misinformation regarding the alleged deviation," but was now representing the appellant in the disciplinary action resulting from the alleged deviation. He believed the information provided by Mr. Awana to FAA about the deviation was "false and/or misstated." With respect to the alleged threat, the appellant stated:

> While I talked with AWANA I don't recall making any threats towards any FAA personnel to include Frank CERUTI. I have had little or no contact with CERUTI. I do not recall that during the times when I have had contact, the contact was in any way threatening.
>
> I have never threatened or made assaultive postures towards any one at the FAA. I have been in a state of ongoing litigation involving members of the FAA management team here at the High Desert TRACON. These FAA personnel are well aware that I will pursue additional administrative, civil and criminal actions against them if they continued (sic) to make false accusations about me or harass me in any way. It is plausible that these management personnel may believe that when I pursue these actions, such actions could be construed by them as a type of threat.
>
> Stated again, I have never threatened or intended to threaten anyone with bodily harm, injury, or death.

*Id.*

The appellant offered a possible reason why Mr. Awana had accused him of making a threat:

> It is possible that AWANA may be angry with me and making these allegations because his wife, while the supervisor did nothing, verbally assaulted me for approximately 10 minutes while in the presence of many other controllers. This exchange was based on a greeting card that was being passed around for all to sign. The content of my writing on the card infuriated AWANA'S wife. This event immediately preceded the allegations of threatening statements. The scope and degree of Ms. Awana's assault was shocking. I made numerous polite requests to terminate the discussions, to which she refused. Ultimately, I was left with no recourse but to demand in very strong terms and what may have been construed as condescending or otherwise embarrassing to her, to cease discussion upon the subject.

*Id.*

The record in this case includes sworn statements by Mr. Awana that the appellant threatened to kill Mr. Ceruti, and a sworn statement by the appellant denying that he ever threatened Mr. Ceruti or any other FAA employee. It is necessary to determine which of these conflicting statements is true in order to

determine whether the agency has proven this charge. The Board has prescribed factors to be used in making and explaining a credibility determination. They include:

1. The witness's opportunity and capacity to observe the event or act in question;
2. the witness's character;
3. any prior inconsistent statement by the witness;
4. a witness's bias, or lack of bias;
5. the contradiction of the witness's version of events by other evidence or its consistency with other evidence;
6. the inherent improbability of the witness's version of events; and
7. the witness's demeanor.

*Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987).

I find that the most relevant factors in this case are those involving bias, and consistency with other evidence. It is undisputed that Mr. Awana was acting as a union representative during his participation in the meeting with the appellant and Mr. Contatore on February 22, 2005, and during the subsequent discussion with the appellant. In his role as a union representative, Mr. Awana had a legal duty to represent the interests of the appellant. *See* 5 U.S.C. § 7114(a)(1) (an exclusive representative is responsible for representing the interests of all employees in the unit it represents without discrimination and without regard to labor organization membership). That legal duty does not support the appellant's claim of bias on the part of Mr. Awana.

There is other evidence in the file that is relevant to both the statement attributed to the appellant by Mr. Awana, and the appellant's claim that Mr. Awana falsely accused the appellant because of the appellant's exchange with Mr. Awana's wife. The appellant submitted a statement by David Paul Whalen, an ATC at the High Desert TRACON. IAF, Tab 29, Subtab AO. Mr. Whalen stated that he observed the exchange between the appellant and Mrs. Awana. He

subsequently went to have lunch in the union office where he found Mr. Awana working on a computer. When Mr. Whalen asked to use the computer, Mr. Awana asked him to "hang on just a minute." According to Mr. Whalen, Mr. Awana got up and closed the door to the office and the following conversation ensued:

> "...and he says I need to talk to you about something. I went okay what's up; and he says well, I just had a conversation with [the appellant]. Like okay; so he proceeds to tell me that – I can only paraphrase most of this—but he said that something pissed off [the appellant], something Frank did pissed off [the appellant]; and the exact words that Awana said that Awana repeated what you said, okay, and what he told me at the time was [the appellant] said, "I'm going to get him."
>
> And I said, "Well what does that mean?" He said I don't know. And I said, "Well what do you think it means?"
>
> And he says, "Well I don't know." And I said, "Well, I'm just telling you right now if you feel it's a physical threat against a federal employee you need to notify management and ASAP."

*Id.*

According to Mr. Whalen's version of his conversation with Mr. Awana, Mr. Awana said he "just had a conversation" with the appellant. This indicates that Mr. Awana had not left the union office between the time he talked to the appellant and the time he talked to Mr. Whalen. Therefore, Mr. Awana would not have known about the appellant's exchange with Mrs. Awana when he talked to Mr. Whelan. Mr. Awana's uncontroverted testimony was that he did not learn of that exchange until he left the union office and returned to work. *See* IAF, Tab 5, Subtab 4f at 17. Accordingly, I find that when Mr. Awana described his conversation with the appellant to Mr. Whelan, he could not have been motivated to fabricate a story about the appellant by the exchange between the appellant and Mrs. Awana.

Mr. Whalen quoted Mr. Awana as saying that the appellant was "pissed off" because of something Frank Ceruti had done. According to Mr. Whelan, Mr.

Awana quoted the appellant as saying about Mr. Ceruti, "I'm going to get him" rather than "I'm going to kill him." Mr. Whelan admitted that he advised Mr. Awana to advise management "ASAP" if he believed the statement by the appellant was a threat to do physical harm. Putting aside the question of whether the appellant said he was going to "get" or "kill" Mr. Ceruti, I find that the statement by Mr. Whelan corroborates Mr. Awana's version of his conversation with the appellant. By Mr. Whelan's account, Mr. Awana was sufficiently concerned about the appellant's statement that he closed the union office door and sought Mr. Whelan's advice as to what he should do about the statement. And, Mr. Whelan understood Mr. Awana to say that the appellant's statement about what he would do to Mr. Ceruti resulted from the fact that the appellant was "pissed off" at Mr. Ceruti.

As noted above, in order to determine whether a threat charge is proven, the Board must determine the actual words used by an appellant to convey an alleged threat. *Larry*, 76 M.S.P.R. at 356. The Board's reviewing Court has long held that when an appellant decides to forego a hearing, the Board must make findings of fact based on the documentary evidence in the record. *See, e.g., Sanders v. United States Postal Service,* 801 F.2d 1328, 1331 (1986). That documentary evidence can be sufficient to meet the agency's burden of proving a charge by preponderant evidence if "there are circumstances which give it credibility and probative value to a reasonable mind." *Id.*

Although Mr. Whalen recalled the words "get him" rather than "kill him," Mr. Awana has consistently used the later phrase in his written statements. He wrote "I'm going to kill him" in his memorandum of February 25, 2005, his sworn statement of March 3, 2005, and his declaration under penalty of perjury dated February 11, 2006. The consistency of the statements on this point enhances their probative value. *See Borninkhof v. Department of Justice*, 5 M.S.P.R. 77, 87 (1981).

Mr. Awana wrote the first of these documents three days after the incident, and was reporting the incident to the FAA Administrator's Hotline, i.e., to his agency's headquarters. His second statement was provided to Special Agency White, who was conducting an official investigation into the incident on behalf of the agency. The third statement was made in the context of this appeal after the appellant withdrew his request for a hearing. Under these circumstances, Mr. Awana should have understood how important it was that he accurately describe the statement made by the appellant. Both his duties as an ATCS and as a union representative required that he pay careful attention to the words spoken by others. Having reviewed the evidence of what the appellant said to Mr. Awana about Mr. Ceruti on February 22, 2005, I find it more likely than not that the appellant said, "I'm going to kill him." Accordingly, I find that the agency has proven by preponderant evidence that these were the actual words spoken by the appellant to Mr. Awana.

In order to determine whether these words constituted a threat, the *Metz* factors must be considered. The first two of these factors address the reactions and apprehension of harm on the part of the person(s) who heard the purported threat. The only person who actually heard the appellant's statement about Mr. Ceruti was Mr. Awana. His reactions included his attempts the day of the incident to inform Mr. Ceruti and two other senior union officials, and his reports of the incident to Operations Supervisor Swanson and Air Traffic Manager Heinrich. Three days later, he reported the incident to the agency's hotline, and followed up with a memorandum describing the incident.

In his statements, Mr. Awana described his apprehension about the possibility of the appellant doing harm to Mr. Ceruti, or to Mr. Awana and his family. He stated that he was buying a "firearm" to protect himself and his family. In light of Mr. Awana's statements and actions on and soon after February 22, 2005, I find that he perceived the appellant's statement to be a threat to kill Mr. Ceruti, and he was apprehensive that the appellant would do harm to

Mr. Ceruti, or to Mr. Awana because he had reported the incident. *Cf. Powell v. Department of Justice*, 73 M.S.P.R. 29, 37 (1997) (Board found no actionable threat when single percipient witness, an Employee Assistance Plan counselor, did not call police, did not warn three of five people named in alleged threat, and did not believe the person who made the statement would harm himself or others). Accordingly, I find that application of the first two *Metz* factors militates toward a finding that the appellant's statement was an actionable threat.

With regard to the appellant's intent when he made the statement about shooting Mr. Ceruti, the Board noted in *Greenough* that the question isn't whether an employee intended to carry out a threat; rather, it is whether the employee intended to make a threat. *Greenough*, 73 M.S.P.R. at 652, *citing Murphy v. Department of Health and Human Services*, 34 M.S.P.R. 534, 538 (1987) (employee's testimony that she did not intend to carry out threat to burn down her supervisor's house did not establish that she did not intend to threaten her supervisor). In light of Mr. Awana's statements, I find that the appellant intended to make a threat against Mr. Ceruti.

There is no evidence that there was any conditional nature to the appellant's statement about killing Mr. Ceruti. The remaining *Metz* factor addresses the circumstances attendant to the alleged threat. There is no dispute about the fact that the appellant's conversation with Mr. Awana occurred immediately after a meeting, during which the appellant had been issued a notice of proposed five-day suspension. Mr. Contatore described the meeting as an "investigatory/Weingarten meeting," and stated that the purposes of the meeting were to question the appellant about his claim for overtime for February 16, 2005, and to issue the appellant the disciplinary proposal for (1) an alleged "operational deviation," and (2) the appellant's alleged providing of "false or misleading information" about that operational deviation. *See* IAF, Tab 28 (declaration of Mr. Contatore and proposal dated February 22, 2005).

Another attendant circumstance was the history of friction between the appellant and Mr. Ceruti. In his declaration, Mr. Contatore stated that the appellant "holds a lot of animosity towards Mr. Ceruti." IAF, Tab 28. Mr. Contatore had been the NATCA facility representative before he successfully bid on a job outside the bargaining unit. He had assigned the appellant a "Union duty" of conducting the facility's traffic count. That traffic count had the potential of justifying "a reclassification of the facility, which would mean higher pay for the employees." However, "nothing came to fruition from [the appellant's traffic count." When Mr. Contatore resigned his NATCA position, he was replaced by Mr. Ceruti. Shortly thereafter, the appellant called Mr. Contatore at work, "yelling at [Mr. Contatore] about the fact that the new facility representative was Mr. Ceruti and that [the appellant] was upset with Mr. Ceruti because Mr. Ceruti had released [the appellant] from the traffic count task. *Id.*

Mr. Ceruti's declaration also addresses the appellant's animus towards him:

> [The appellant] harbored ill feeling towards me because I have routinely brought to management's attention and consideration to things that [the appellant] has attempted to accomplish underhandedly. He tried to get me impeached out of my position as the facility's President-elect of NATCA three to four years ago.

Mr. Ceruti confirmed that he had "released the appellant from his Union-assigned task of traffic count for the facility" and that the appellant was "very upset" about his actions. IAF, Tab 28 (declaration of Mr. Ceruti).

By letter dated February 20, 2003, the NATCA Executive Vice President informed the appellant that Mt. Ceruti had filed an "internal grievance" against the appellant alleging that the appellant had violated the NATCA National Constitution by assisting in the filing of a lawsuit against NATCA Local E10 (at High Desert TRACON) and the officers of the local. Mr. Ceruti sought as relief that the appellant be compelled to reimburse the local for all costs of defending against the lawsuit, and that he be "expelled from this Union and barred from joining in the future." IAF, Tab 19, Subtab X.

Another attendant circumstance was an earlier incident when the appellant was stopped while attempting to drive onto Edwards AFB with weapons in his car. In 1999, the appellant's vehicle was searched by Air Force personnel after he tried to drive on the base. Among the items found in his car were a nine millimeter pistol, ammunition, a magazine and a speed loader for the pistol, ammunition for a pistol of a different caliber, and a "Buck knife" with a six-inch blade. IAF, Tab 19, Subtab Z at 55. According to Mr. Whalen, this incident became common knowledge among the employees High Desert TRACON. *Id.*, Tab 29, Subtab AO.

To sum up the relevant, attendant circumstances, the appellant had a long-term history of conflict with Mr. Ceruti as of February 22, 2005. He was "pissed off" at Mr. Ceruti at the time he had the conversation with Mr. Awana. He had just left a meeting at which he was questioned about one incident that could potentially lead to a disciplinary action, and issued a five-day suspension proposal based on another incident. It was very likely that the appellant realized he would need the assistance of his union to effectively contest any imminent disciplinary action, but his union local was led by Mr. Ceruti. Taken together, these circumstances support a finding that the statement made by the appellant to Mr. Awana was a threat.

Having applied the *Metz* criteria to the facts in this case, I find that the agency has proven by preponderant evidence that the appellant threatened to kill Mr. Ceruti on February 22, 2005. Accordingly, I find that the first charge is SUSTAINED.

<u>Charge Two: Working beyond shift without authorization to do so and then claiming it as overtime</u>

In his proposal to remove the appellant, Mr. Heinrich gave the following account of the events leading to the second charge. On February 16, 2005, the appellant's work shift was scheduled to end at 1:45 p.m. (1345). The appellant requested permission to leave work one hour early in order to "gather

information" from his physician for his "medical clearance" forms. The appellant's request was denied because of staffing consideration. The appellant was relieved from his ATCS position at 1:37 p.m. so he could sign out at 1:45 p.m. However, he did not sign out as required on the sign-in sign-out log (FAA Form 7230.4-2). The oncoming shift supervisor therefore annotated the sign-out log to show that the appellant had left at the end of his shift (1:45 p.m.). When the appellant returned to work that night to begin the mid shift, the log still indicated 1:45 p.m. as the appellant's departure time from the earlier shift. Sometime during the mid shift, the appellant changed his sign-out time for the earlier shift to read 2:30 p.m. and wrote 45 minutes overtime in the remarks section of the form. Mr. Heinrich alleged that no overtime had been "assigned or authorized" for the appellant to "complete the necessary paperwork to continue to maintain [his] medical clearance. IAF, Tab 5, Subtab 4a.

In a declaration under penalty of perjury, Mr. Contatore stated that he was the Operations Supervisor on February 16, 2005. He stated that the appellant did not request his approval of overtime for that day. If the appellant's medical clearance was due to expire that day, he would have been notified as the Operations Supervisor. He also stated that he had counseled the appellant on December 17, 2004, on "the overtime and shift changing approval policies." The record of conversation attached to the declaration indicates that on or before December 17, 2004, the appellant had unilaterally changed his shift start and end times in a way that the appellant believed entitled him to ten minutes of overtime. However, according to the record of conversation, Mr. Contatore told the appellant that he could not have overtime because it was neither requested nor approved. IAF, Tab 28 (declaration of Richard Contatore with attachment).

Susan M. Marmet, Operations Manager at High Desert TRACON, stated in a declaration under penalty of perjury that she did not tell the appellant that he needed to have his "medical documents in order" before he could work the mid shift on February 16, 2005. In fact, she stated, she was not at work on February

16, 2005. Ms. Marmet checked the appellant's medical certification documents (which are attached to her declaration) and found that, as of February 16, 2005, his medical clearance was effective until February 20, 2005. Attached to Ms. Marmet's declaration is the sign-in sign-out log for February 16, 2005, showing the appellant's annotation ".45 OT medical" in the remarks column, as well as "1430" as the sign-out time he wrote for his earlier shift. Ms. Marmet stated that "management did not assign [the appellant] any overtime, nor did management approve any request from [the appellant] for the overtime." Also attached to the declaration is a written admonishment issued to the appellant by Ms. Marmet on December 6, 2004. The appellant was admonished for, among other things, signing in for duty at a time when he was "not even in the facility." Ms. Marmet described this action as "falsifying government records" and warned the appellant that any future recurrence "may result in formal disciplinary measures." *Id.* (declaration of Susan M. Marmet with attachments).

On February 22, 2005, Mr. Contatore questioned the appellant about his overtime claim for February 16, 2005. When asked why he had claimed overtime, the appellant replied that he had a "work related mandate." When asked who approved his overtime, the appellant responded that he did "not know yet." When asked if anyone gave him duty time to obtain medical documents, the appellant answered "the FAA administrator." *Id.* (attachment to declaration of Richard Contatore).

The appellant does not dispute the agency's allegations that he changed his sign-out time for his first shift on February 16, 2005, from "1345" to "1430" and claimed 45 minutes of overtime for that period of time.

The applicable collective bargaining agreement (CBA) between the agency and NATCA states that "all medical examinations required by the Agency shall be scheduled on duty time." IAF, Tab 5, Subtab 4r (CBA, Article 66, section 4). It is undisputed that the appellant spent the 45 minutes at issue not working as an ATC at his duty station, but attempting to obtain documents related to his medical

clearance to work as an ATC. Although the charge includes the words "working beyond shift," I find that the agency used the word "working" to mean engaging in an activity which would require compensable duty time under the CBA. *See James v. Department of the Air Force*, 73 M.S.P.R. 300, 303 (1997) (the Board must construe a charge in light of the accompanying specifications. In resolving the issue of how charges should be construed, the structure and language in the proposal notice must be examined).

The appellant clearly considered the 45 minutes he spent obtaining his medical documents as "hours worked." In a letter to Susan Marmet dated March 18, 2005, the appellant wrote that he had not "received appropriate emoluments" for his claimed overtime on February 16, 2005. He explained that he did not indicate the time his first shift ended when he left the facility to get his medical documents because he did not know until later "the full amount of hours worked" on that shift, *i.e.*, he did not know when he left how much overtime he would eventually claim for the trip to obtain the medical documents. *See* IAF, Tab 19, Subtab j.

The agency has shown that the appellant was not entitled to work overtime unless he had prior authorization to do so. The CBA states that "[e]mployees are not eligible for overtime pay for work in excess of eight hours in an administrative workday, except in cases where they have been called in before the beginning, or held over beyond the end, of their scheduled shift." IAF, Tab 5, Subtab 4r (CBA, Article 38, section 5). Mr. Contatore had counseled the appellant on the requirements to request overtime and have it approved just two months before February 16, 2005. The agency has shown that the appellant did not receive authorization to use duty time after his shift to obtain his medical documents.

In light of all the evidence in the record, I find that the agency proved by preponderant evidence that on February 16, 2005, the appellant worked beyond

the scheduled end of his shift without authorization, and then claimed 45 minutes overtime. Accordingly, the second charge is SUSTAINED.

The appellant failed to show that the agency committed harmful procedural error.

In a pleading entitled Appellant's Statement of Issues; Affirmative Defenses, the appellant listed over 50 "issues in this action," but did not identify which of those issues are allegations that the agency committed harmful procedural errors. IAF, Tab 20 at 2-3. For example, the appellant listed as issues "whether the Agency violated Appellant's constitutional rights" and "whether the Agency concealed material facts." *Id.* at 2.

Although the appellant submitted many hundreds of documents in support of this appeal, he has not, with the exceptions note below, made specific allegations of agency procedural errors in taking the removal action. One specific argument made by the appellant was that he was constructively suspended by the agency from February 22, 2005, until he was removed on September 30, 2005. He apparently argued that the removal must be reversed because the constructive suspension, which was based on the same alleged misconduct, was procedurally defective in that he received no notice of the suspension. IAF, Tab 29 at 15.

The appellant has not, however, produced any evidence that he was suspended prior to his removal. According to his notes of his telephone conversations with management officials at High Desert TRACON, he was told on February 22, 2005, that he would be on administrative leave, not on suspension. IAF, Tab 19, Subtab 9 at 5. The removal proposal informed the appellant that he would "remain in a non-duty pay status during" the notice period. IAF, Tab 5, Subtab 4a at 1. That language indicates that the appellant remained on administrative leave, not on suspension. I find that the appellant's argument about a defective suspension is not supported by the record. Accordingly, I find that the appellant has not proven any harmful procedural error related to his duty status prior to his removal.

The appellant also argued that the agency "failed to promptly initiate this action," citing Article 10, section 4 of the CBA. IAF, Tab 29 at 15. That CBA section states:

> All facts pertaining to a disciplinary/adverse action shall be developed as promptly as possible. Actions under this Article shall be promptly initiated after all the facts have been made known to the Agency.

On May 20, 2005, Special Agent White signed the Report of Investigation of the threat made by the appellant. IAF, Tab 5, Subtab 4f. The proposal to remove the appellant was issued on July 27, 2005. *Id.*, Subtab 4a. There is no evidence in the record as to when Mr. Heinrich received the Report of Investigation. But even if he received it on May 20, 2005, there is no record evidence that the delay of approximately nine weeks before a proposal was issued, by itself, violated the CBA. I find that the appellant has not proven that the removal was not "promptly initiated after all the facts" were made known to the agency. Accordingly, I find that the appellant failed to prove any procedural error in this regard.

The appellant claimed that the removal proposal did not apprise him of the charges with sufficient clarity to enable him to "formulate a coherent reply." IAF, Tab 29 at 50-58. He cited *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1983), in support of this claim of harmful error. In recognition of the Supreme Court's holding in *Loudermill* the Board has long held that an employee must receive advance written notice stating the specific reasons for a proposed action, and that the notice must sufficiently inform the employee of the claims with which he is being charged so that he may adequately prepare and present a defense before the agency. *See, e.g., Brown v. United States Postal Service*, 47 M.S.P.R. 50, 57 (1991) *citing* 5 U.S.C. § 7513(b)(1) (An employee against whom an action is proposed is entitled to...written notice...stating the specific reasons for the proposed action).

Having reviewed the notice of the appellant's proposed removal, I find that both charges were described clearly and specifically in that notice. The appellant was informed that he was accused of saying that he would "kill" a person named "Frank" during a conversation with Mr. Awana on February 22, 2005. The charge of working beyond his shift was spelled out in similar detail. IAF, Tab 5, Subtab 4a. On May 18, 2005, the appellant was questioned by Special Agent White about his conversation with Mr. Awana on February 22, 2005. He was specifically asked about statements he made about Frank Cerutti. IAF, Tab 5, Subtab 4f at 37. I find that the notice was sufficiently clear so as to comply with the appellant's rights under *Loudermill* and 5 U.S.C. § 7513(b)(1).

<u>The appellant failed to prove retaliation for whistleblowing.</u>

The appellant claims that there were two instances when he made protected disclosures before being removed. The first was after the agency proposed suspending the appellant for five days based on charges of negligence and providing false or misleading information. IAF, Tab 29 at 19-23. The proposal was issued by Mr. Contatore on February 22, 2005; the appellant replied orally and in writing on March 15, 2005; Mr. Contatore issued a decision to suspend the appellant on March 31, 2005; and the appellant was suspended for five days beginning April 4, 2005. IAF, Tab 5 Subtabs 4g – 4j.

The appellant stated that he submitted a response to the proposed suspension entitled, "Greg Morgan's Reply to the Agency's Proposed Disciplinary Action, Grievance, and Cross-Complaint." He stated that he gave this document to Mr. Swanson and to Mr. Heinrich, with instructions to give a copy to John Clancy "who was the top of the line of business." IAF, Tab 29 at 22.

The document described by the appellant is at IAF, Tab 29, Subtab AN. In the "cross complaint" portion of that document, the appellant alleged that Mr. Contatore "violated his duty and broke the law in presenting materially false, fictitious, or fraudulent statements" in his Final Operational Deviation/Error

Report (FODR). The appellant alleged that Mr. Contatore submitted this falsified report to "Washington" and that the appellant's suspension was improperly based on this falsified report. IAF, Tab 29, Subtab an at 57-58.

The second instance of whistleblowing activity identified by the appellant was his report to the agency's Office of the Inspector General (OIG) dated April 30, 2004. IAF, Tab 19, Subtab y. In that report, the appellant identified what he considered to be a safety issue resulting from a local order promulgated by management at the High Desert TRACON. In essence, the appellant stated that local management's insistence that ATCSs input data in an agency data base in accordance with a "rigid time parameter" created a hazardous condition when the ATCS was working a "single person midnight shift." Depending on the "dynamics of [aircraft]traffic," it would not be safe, according to the appellant, for the single ATCS on duty to sit at a different computer terminal inputting data rather than at his or her ATCS work station monitoring aircraft. The appellant identified Mr. Heinrich and Ms. Marmet as being responsible for the local order. *Id.* at 6-10.

I find that both of the disclosures identified by the appellant were protected by 5 U.S.C. § 2301(b)(8). In his cross complaint, the appellant disclosed what he asserted was a violation of the law prohibiting the falsification of official government documents. This disclosure was covered by section 2301(b)(8)(A)(i) (a violation of any law, rule, or regulation). It is not necessary for the appellant to prove that Mr. Contatore falsified the FODR, *Scott,* 69 M.S.P.R at 237, and I make no finding on that question. It is sufficient for the appellant to show that he reasonably believed that the report was falsified. In light of his detailed analysis of his alleged operational error, I find that he could have reasonably believed that his version of events was accurate and Mr. Contatore's was not.

In his report to OIG, the appellant disclosed what he considered to be a "specific danger to public health or safety," which is covered by section 2301(b)(8)(A)(ii). In evaluating a disclosure related to public health or safety,

the Board must determine whether the person making the disclosure could reasonably believe that the matter disclosed constituted a substantial and specific public health or safety danger. *Herman v. Department of Justice,* 193 F.3d 1375, 1379 (Fed. Cir. 1999). The appellant identified a specific circumstance, an ATCS working alone at night diverted from his aircraft monitoring duties to input data, which he could reasonably believe created a hazard for people aboard aircraft in his area of control. That is not to say that management at High Desert TRACON did create such a hazard, as the record in this appeal is not sufficiently developed on that point. But for purposes of raising a whistleblower retaliation defense, it is only necessary for the appellant to show that he could have reasonably believed there was a danger. I find that the appellant has shown that he could have had that belief.

Having established that he made protected disclosures, the appellant must also show that they were contributing factors in his removal. There is no question that Mr. Heinrich was aware of the appellant's first disclosure because the appellant gave him the document including the disclosure. As for the report to OIG, I note that the appellant sent a courtesy copy of the report to Marion C. Blakey, Administrator, Federal Aviation Administration. IAF, Tab 19, Subtab y at 1. Given the nature of the appellant's report to OIG, I find it more likely than not that Mr. Heinrich was aware of this report by the time he issued the notice of proposed removal to the appellant. As for the timing of the protected activity, the complainant sent his report to OIG about 15 months before his removal proposal was issued; his cross complaint was issued less than three months before the proposal was issued. Based on this circumstantial evidence, I find that the appellant's protected activity was a contributing factor in his removal.

My findings above regarding the appellant's protected activity shift the burden to the agency to show by clear and convincing evidence that it would have taken the removal action absent his protected disclosures. There is no evidence in the record of any agency employees similarly situated to the appellant who

were not whistleblowers, so that factor is not relevant to this case. *Carr*, 185 F.3d at 1326-7. The relevant factors are the strength of the agency's evidence in support of its action, and the motive to retaliate on the part of the agency officials involved in the decision to remove the appellant. *Id.* at 1323.

I find that the evidence submitted by the agency in support of both charges, as discussed above, meets the clear and convincing standard. The action to remove the appellant was a direct result of the report of the appellant's threat to kill Mr. Ceruti by Mr. Awana, who was a union representative, not a member of management. As noted above, I found Mr. Awana's statements to be consistent and credible. As for the second charge, the appellant did not refute the facts underlying the charge, and only offered a facetious explanation ("the FAA Administrator") when asked who authorized his claimed overtime.

As for retaliatory motive, Mr. Heinrich was named in the appellant's report to OIG, but there is no evidence suggesting that he would have removed the appellant 15 months later but for the complaint from Mr. Awana. A threat to kill another employee is extremely serious misconduct, for which removal may be imposed. As the Board's reviewing Court noted, the Whistleblower Protection Act is not meant to protect employees from their own misconduct. *Carr,* 185 F.3d at 1326. I find that any possibility that Mr. Heinrich had a retaliatory motive is strongly outweighed by the compelling evidence that the appellant committed the charged misconduct. Accordingly, I find that the appellant has failed to prove his affirmative defense of retaliation for whistleblowing.

<u>Nexus and Penalty</u>

The agency must show that there is a nexus between the sustained charge(s) and either the employee's ability to accomplish his duties satisfactorily or some other legitimate government interest. *See Merritt v. Department of Justice*, 6 M.S.P.R. 585, 596 (1981), *modified*, *Kruger v. Department of Justice*, 32 M.S.P.R. 71, 175 n.2 (1987). There can be no doubt that the agency has a

legitimate interest in not having its employees subjected to threats of bodily harm. There is also a direct connection between the efficiency of the service and employees' compliance with time and attendance rules such as the requirement for prior approval of overtime. I find that the agency has satisfied the nexus requirement.

Where, as here, the only agency charges have been sustained, the Board will review an agency-imposed penalty only to determine if the agency considered all of the relevant factors and exercised management discretion within tolerable limits of reasonableness. *Douglas*, 5 M.S.P.R. at 306. Thus, the Board will disturb the agency's chosen penalty only if it finds that the agency failed to weigh relevant factors[7] or that the agency's judgment clearly exceeded the limits of reasonableness. *Toth v. U.S. Postal Service*, 76 M.S.P.R. 36, 39 (1997).

Because Mr. Heinrich issued both the proposal and the decision to remove the appellant, his consideration of the *Douglas* factors is reflected in the proposal notice. IAF, Tab 5, Subtab 4a at 2-3. Among the *Douglas* factors, the Board places primary importance upon the nature and seriousness of the offense, and its relation to the appellant's duties, position, and responsibilities. *See Jones v. Department of the Interior,* 97 M.S.P.R. 282, 288 (2004). With respect to the seriousness of the threat charge, Mr. Heinrich stated that "threatening and intimidating language will not be tolerated in the workplace" and that "there is no tolerance for any threatening statements made to any individual or to the facility as a whole. *Id.* at 2. Regarding the overtime charge, Mr. Heinrich stated it was

---

[7] I find that the relevant factors in this case are the nature and seriousness of the offense, the job level and type of employment, the past disciplinary record, the past work record, the effect of the offense on the supervisor's confidence in the appellant's ability to perform his duties, consistency with the table of penalties, the clarity of notice, the potential for rehabilitation, and the adequacy of alternative sanctions. Factors not relevant to this appeal are consistency of penalty with those imposed on other employees, notoriety of the offense, and other mitigating circumstances such as provocation by others. *Douglas*, 5 M.S.P.R. at 305-06.

"imperative" that the appellant comply with directives such as those applicable to overtime approval because he acted as a certified Controller in Charge. *Id.* at 3.

Mr. Heinrich also addressed the applicability of the *Douglas* factors in a document considered "Douglas Factors Considered." IAF, Tab 23 at 20-21.[8] regarding the seriousness of the appellant's misconduct, he wrote that "intentionally making a claim for overtime is a clear violation of rules and regulations on which [the appellant] has been briefed and counseled. Regarding the threat charge, he wrote:

> In addition, we have all been made aware of safety concerns and threats to the facility, those within the facility and the ATC system since 9/11/01. To make threats is contrary to all of the education we have provided regarding safety from terrorists threats.

*Id.* at 20.

With regard to the appellant's job level and type of employment, Mr. Heinrich found that "Air Traffic Control is a service where following rules is essential to the safety of the flying public" and that the appellant's "wanton disregard for rules and regulations puts into doubt [the appellant's' regard for this safety-critical position." *Id.* In the proposal, Mr. Heinrich described the ATCS job as a "unique and demanding position with immense responsibility for the lives and property of others." He included "soundness of judgment" among the basic requirements of the position, and found that "taking responsibility and admission of your own errors is critical to the continued safety of the flying public. IAF, Tab 5, Subtab 4a at 2.

In the proposal notice, Mr. Heinrich addressed the appellant's disciplinary history. He listed six occasions when the appellant had been counseled for various infractions, two letters of admonishment, and a five-day suspension on

---

[8] In his declaration of February 13, 2006, Mr. Heinrich stated that he prepared the Douglas Factors Considered document before deciding to remove the appellant. IAF, Tab 28.

March 5, 2005. *Id.* at 3. As I informed the parties during a prehearing conference , IAF, Tab 24 at 5, because the five-day suspension had not been decided by February 16, or February 22, 2005, the dates of the alleged misconduct at issue in this appeal, the suspension could not be cited by the agency as a prior disciplinary action under the *Douglas* factor concerning an employee's prior disciplinary record. *See, e.g., Fowler v. United States Postal Service*, 77 M.S.P.R. 8 (1997). Therefore, it was error for Mr. Heinrich to cite that disciplinary action as an aggravating fact under the past disciplinary record *Douglas* factor.

However, in his Douglas Factors Considered document, Mr. Heinrich does not list the suspension as a prior disciplinary action. He wrote that the appellant had received two written admonishments and had been counseled "over 5 times in the last ten months." I find, therefore, that Mr. Heinrich did not consider the five-day suspension as a prior disciplinary action in making his penalty determination. Under the CBA applicable to the appellant, a written admonishment is considered an informal disciplinary action, and may be grieved under the negotiated grievance procedure. IAF, Tab, Subtab 4g (CBA, Article 10, Sections 1 and 17).

On May 7, 2004, the appellant was issued a written admonishment for failure to complete "all mid-shift paper work." IAF, Tab 5, Subtab 4l. On December 6, 2004, the appellant was issued a written admonishment because he "abused several of [his] breaks and because he signed in at a time when he was not present at his work site. *Id.*, Subtab 4k. The appellant was informed in writing of the written admonishments, he had an opportunity to contest them through the grievance procedure, and the written admonishments were made a part of his record. Having reviewed both written admonishments, I find that neither is clearly erroneous. Thus, the agency properly relied on these disciplinary actions in deciding on a penalty for the misconduct at issue in this appeal. *Bolling v. Department of the Air Force*, 9 M.S.P.R. 335, 338-39 (1981).

Although the counseling sessions cited by Mr. Heinrich are not prior disciplinary actions within the meaning of *Douglas* and *Bolling*, they are relevant to the past work record *Douglas* factor.

The agency included two different tables of penalties in its initial response to this appeal. The Federal Aviation Personnel Manual (FAPM) Letter 2635, dated November 16, 1989, specifies a letter of reprimand to a five-day suspension as the range of penalties for a first offense of "Disorderly conduct, or threatening another while on the job or on FAA property." IAF, Tab 5, Subtab 4q at 23. The agency also submitted the table of penalties from the agency's Human Resources Operating Instructions (HROI), which was effective August 10, 2000, "unless otherwise specified for a collective bargaining unit." By its own terms, this table of penalties replaced the FAPM table of penalties unless "any applicable collective bargaining agreement contains provisions that conflict with this HROI and/or until all bargaining obligations with individual collective bargaining units have been completed." *Id.*, Subtab 4s at 1. According to this table of penalties, the first offense of "threatening another" calls for a 14-day suspension to removal. *Id.* at 3.

The appellant argued that the FAPM table of penalties applied to him when the decision was made to remove him, but did not address whether or when the HROI table of penalties superseded the FAPM version for his bargaining unit. IAF, Tab 42 at 42. The agency did not explain why two tables of penalties were submitted, and also did not address the issue of the HROI version replacing the FAPM version for the appellant's bargaining unit. It is undisputed that the CBA provided by the agency, which became effective in September 2003, covered the appellant at the time of his removal. IAF, Tab 5. I note that the Disciplinary/Adverse Actions Article in the CBA does not include any provisions inconsistent with the HROI table of penalties; Section 13 of Article 10 refers to the "Agency's table of penalties," without further specification. In light of the fact that the CBA was executed more than three years after the HROI version was

effective, and in the absence of any conflicting language in the CBA, I find that the HROI table of penalties applied to the appellant at the time of his removal, and that removal for a first offense of threatening to kill another employee was was consistent with that table of penalties.

Having reviewed his proposal notice and his Douglas Factors Considered document, I find that Mr. Heinrich considered the relevant Douglas factors before deciding to remove the appellant. Although the appellant had over twenty years of Federal service, I find that the agency-imposed penalty is within the bounds of reasonableness. Based on the foregoing, I find that the agency has shown that the action taken promotes the efficiency of the Federal service. 5 U.S.C. § 7513(a).

## DECISION

The agency's action is AFFIRMED.

FOR THE BOARD:

Gerard C. Dasey
Administrative Judge

## NOTICE TO APPELLANT

This initial decision will become final on **August 18, 2006**, unless a petition for review is filed by that date or the Board reopens the case on its own motion. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. You must establish the date on which you received it. The date on which the initial decision becomes final also controls when you can file a petition for review with the Court of Appeals for the Federal Circuit. The paragraphs that follow tell you how and when to file with the Board or the federal

court. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

**BOARD REVIEW**

You may request Board review of this initial decision by filing a petition for review. Your petition, with supporting evidence and argument, must be filed with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.,
Washington, DC 20419

A petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition for review submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

If you file a petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. Your petition must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you more than 5 days after the date of issuance, 30 days after the date you actually receive the initial decision. If you claim that you received this decision more than 5 days after its issuance, you have the burden to prove to the Board the date of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your

petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j).

**JUDICIAL REVIEW**

If you are dissatisfied with the Board's final decision, you may file a petition with:

The United States Court of Appeals
for the Federal Circuit
717 Madison Place, NW.
Washington, DC 20439

You may not file your petition with the court before this decision becomes final. To be timely, your petition must be received by the court no later than 60 calendar days after the date this initial decision becomes final.

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703). You may read this law, as well as review the Board's regulations and other related material, at our website, http://www.mspb.gov. Additional information is available at the court's website, http://fedcir.gov/contents.html. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, and 11.

**NOTICE TO AGENCY/INTERVENOR**

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

Appellant

Electronic Mail

Greg A. Morgan
2010 W. Avenue K #427
Lancaster, CA 93536

Agency Representative

Electronic Mail

Lisa J. Toscano, Esq.
Department Of Transportation
Federal Aviation Administration
Western-Pacific Region
Office of the Regional Counsel, AWP-7
P.O. Box 92007
Los Angeles, CA 90009-2007

July 14, 2006
(Date)

Judy Mattias
Judy Mattias
Paralegal Specialist

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**

GREG A. MORGAN,
Appellant,

v.

DEPARTMENT OF TRANSPORTATION,
Agency.

DOCKET NUMBER
SF-0752-06-0090-I-1

DATE: March 22, 2007

Greg A. Morgan, Lancaster, California, pro se.

Lisa J. Toscano, Esquire, Lawndale, California, for the agency.

**BEFORE**

Neil A. G. McPhie, Chairman
Mary M. Rose, Vice Chairman
Barbara J. Sapin, Member

**FINAL ORDER**

The appellant has filed a petition for review in this case asking us to reconsider the initial decision issued by the administrative judge. We grant petitions such as this one only when significant new evidence is presented to us that was not available for consideration earlier or when the administrative judge made an error interpreting a law or regulation. The regulation that establishes this standard of review is found in Title 5 of the Code of Federal Regulations, section 1201.115 (5 C.F.R. § 1201.115).

After fully considering the filings in this appeal, we conclude that there is no new, previously unavailable, evidence and that the administrative judge made no error in law or regulation that affects the outcome. 5 C.F.R. § 1201.115(d).

Therefore, we DENY the petition for review. The initial decision of the administrative judge is final. This is the Board's final decision in this matter. 5 C.F.R. § 1201.113.

**NOTICE TO THE APPELLANT REGARDING YOUR FURTHER REVIEW RIGHTS**

You have the right to request the United States Court of Appeals for the Federal Circuit to review this final decision. You must submit your request to the court at the following address:

United States Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

The court must receive your request for review no later than 60 calendar days after your receipt of this order. If you have a representative in this case, and your representative receives this order before you do, then you must file with the court no later than 60 calendar days after receipt by your representative. If you choose to file, be very careful to file on time. The court has held that normally it does not have the authority to waive this statutory deadline and that filings that do not comply with the deadline must be dismissed. *See Pinat v. Office of Personnel Management*, 931 F.2d 1544 (Fed. Cir. 1991).

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703). You may read this law, as well as review the Board's regulations and other related material, at our website, http://www.mspb.gov. Additional information is available at the court's website, http://fedcir.gov/contents.html. Of particular relevance is the

court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, and 11.

FOR THE BOARD:

Bentley M. Roberts, Jr.
Clerk of the Board

Washington, D.C.