# In the United States Court of Federal Claims

## No.  07-707C

### (Filed June 24, 2010)

| | |
|---|---|
| _____ ) | |
| DAVID WHALEN, *et al.*, ) | Suit by air traffic control specialists at Edwards |
| ) | Air Force Base for compensation for overtime labor |
| Plaintiffs, ) | under the Fair Labor Standards Act, 29 U.S.C. |
| ) | §§ 201-219; cross-motions for summary judgment; |
| v. ) | permissibility of a credit-hour arrangement; |
| ) | compensable work; time spent undergoing security |
| UNITED STATES, ) | inspections; time spent on medical clearances |
| ) | |
| Defendant. ) | |
| _____ ) | |

R. Rex Parris, R. Rex Parris Law Firm, Lancaster, California, for plaintiffs.  With him on the briefs were Alexander R. Wheeler, Jason P. Fowler, and Kitty Szeto, R. Rex Parris Law Firm, Lancaster, California.

William P. Rayel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Todd M. Hughes, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel were Parisa Naraghi-Arani and Julia Rhodes, Federal Aviation Administration, Office of Chief Counsel, Washington, D.C.

**OPINION AND ORDER**

LETTOW, Judge.

This Fair Labor Standards Act case involves Air Traffic Control Specialists ("ATCSs") employed by the Federal Aviation Administration ("FAA") at the High Desert Terminal Radar Approach Control ("TRACON"), Edwards Air Force Base, California ("Edwards AFB"). Plaintiffs seek damages in the form of compensation for overtime labor under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201-219 (the "Act" or "FLSA").

Previously, the court addressed procedural issues in the case by (1) granting a motion by the government for dismissal of this action as to one named plaintiff but rejecting a motion for a

more definite statement, *Whalen v. United States*, 80 Fed. Cl. 685 (2008) ("*Whalen I*"), and then (2) conditionally certifying a collective action encompassing two initially named plaintiffs and all other similarly situated ATCSs at Edwards Air Force Base and authorizing notice to all such similarly situated persons. *Whalen v. United States*, 85 Fed. Cl. 380 (2009) ("*Whalen II*"). After receiving notice, other ATCSs opted to join the suit, and plaintiffs subsequently filed a motion for partial summary judgment, to which the government responded by filing a cross-motion for summary judgment. After briefing, the motions were argued at a hearing on April 26, 2010, and are now ready for disposition.

The statute of limitations for willful violations of the FLSA is three years and that for quotidian violations of the FLSA is two years. 29 U.S.C. § 255(a). Plaintiffs filed their complaint on October 1, 2007; therefore, this action potentially reaches back to events dating from October 1, 2004.

## BACKGROUND[1]

Fourteen of the plaintiffs are or were operational ATCSs at the High Desert TRACON, located on Edwards Air Force Base. Pls.' Proposed Findings of Uncontroverted Facts ¶ 1 ("Pls.' PFUF"); Def.'s Proposed Findings of Uncontroverted Facts ¶ 1 ("Def.'s PFUF"); *e.g.*, App. to Pls.' Mot. for Partial Summary Judgment ("Pls.' App.") 008, 10:18-22 (Dep. of Phillip John Delgado (Oct. 29, 2009) ("Delgado Dep.")).[2] The principal activity of a controller is to separate and direct live air traffic, which essentially consists of viewing a radar terminal in a control room, directing pilots to ensure that their aircraft remain adequately separated from other aircraft, sequencing aircraft, and providing course guidance. Def.'s PFUF ¶¶ 3-4; App. to Def.'s Cross-Mot. for Summary Judgment ("Def.'s App.") 275, ¶¶ 3-4 (Decl. of Mark Heinrich (Jan. 25, 2010) ("Heinrich Decl.")).[3]

Plaintiffs' claims for overtime pay arise from three activities: (1) the FAA's periodic payment of plaintiffs with credit hours and not overtime compensation; (2) the lack of compensation for time spent in security inspections at the entrance and exit gates to Edwards

---

[1]The recitations that follow do not constitute findings of fact by the court. Instead, the recited factual elements are taken from the parties' filings and are either undisputed or are alleged and assumed to be true, except where a factual controversy is explicitly noted.

[2]An additional plaintiff, Michael J. Zagar, was an Air Traffic Assistant at TRACON from approximately November 25, 2007 to April 27, 2008. Def.'s PFUF ¶ 2; Pls.' App. 355, ¶ 1 (Decl. of Michael J. Zagar (Dec. 11, 2009) ("Zagar Decl.")).

[3]Mr. Zagar, as an Air Traffic Assistant, assisted the controllers in the performance of their duties by delivering flight information to control positions, making computer entries of new and amended flight plans as directed by controllers, relaying clearances to pilots and controllers, and relaying weather, airspace, and airport information to controllers. Def.'s PFUF ¶ 5; Def.'s App. 275, ¶ 5 (Zagar Decl.).

AFB and in related activities; and (3) the lack of compensation for time spent traveling to or from required medical examinations (one-way travel was compensated), for time spent obtaining medical examinations associated with waivers of medical standards, and for reimbursement of medical expenses and mileage attendant to medical-waiver examinations.

*A. Credit Hours*

The FAA, in accord with its personnel management system, *see* Def.'s App. 394 (FAA Personnel Management System (Mar. 28, 1996)), and a series of collective bargaining agreements entered between the FAA and the National Air Traffic Controllers Association, AFL-CIO, *see* Def.'s PFUF ¶ 41; Def.'s App. 299-300, ¶¶ 4-7 (Decl. of Michael S. Herlihy (Jan. 22, 2010) ("Herlihy Decl.")),[4] provided its employees with a credit-hour system as an optional alternative to overtime. The credit-hour arrangement allowed ATCSs who worked in the High Desert TRACON to request, in advance, to work hours in excess of their basic work requirement, subject to FAA's approval, and thereby receive "credit hours" for such work. Pls.' App. 430, ¶ 1 (Stipulation by the Parties Regarding Credit Hours (Nov. 18, 2009) ("Stip. for Credit Hours")). Recourse to the credit-hour system was entirely voluntary on the part of ATCSs. *Id*. When plaintiffs worked credit hours, they received one credit hour for each hour worked, equal to one hour of paid leave. *Id*. ¶¶ 2-3.[5] Under the latest collective bargaining agreement entered on October 1, 2009, plaintiffs may no longer request and earn credit hours, although they do retain any credit hours previously earned and can receive payment for unused credit hours at the regular hourly rate upon separation or conversion to a non-flexible schedule. *Id*. at 431, ¶ 8. Plaintiffs who worked credit hours from October 1, 2004 to September 30, 2009, *see, e.g.*, Pls.' App. 062, 80:17-20 (Dep. of Dennis Albert Hambrick (Sept. 30, 2009) ("Hambrick Dep.")), now claim that they should have been paid the FLSA overtime rate of "one and one-half times" their regular rate, 29 U.S.C. § 207(a)(1), rather than receiving one credit hour for each hour worked. *See* Pls.' Mot. for Partial Summary Judgment at 11 ("Pls.' Mot.").

---

[4]Since September 1998, the employment of ATCSs has been governed by four collective bargaining agreements. *See* Def.'s App. 301-357 (Excerpts from collective bargaining agreements entered into in September 1998, September 2003, September 2006, and October 2009).

[5]From October 1, 2004 to September 2, 2006, plaintiffs could accrue credit hours without limit, although plaintiffs could not exchange unused credit hours for cash at any point, including at the end of their employment or conversion to a non-flexible schedule. Pls.' App. 430, ¶¶ 4-5 (Stip. for Credit Hours). From September 6, 2006 to September 30, 2009, plaintiffs could carry over a balance of up to 24 credit hours each pay period. Any credit hours previously earned that exceeded the 24-hour maximum were retained by plaintiffs, but plaintiffs were prohibited from earning any additional credit hours until the hours accrued had been used to bring the balance below the 24-hour maximum. *Id*. ¶ 6. Additionally, from September 3, 2006 to September 30, 2009, plaintiffs could receive payment for unused credit hours (up to a maximum of 24 hours) at their regular hourly rate upon separation or conversion to a non-flexible schedule. *Id*. at 431, ¶ 7.

*B. Security Inspections*

Plaintiffs allege that the FAA failed to compensate them with overtime pay for time they spent submitting to mandatory security inspections at the entrance and exit gates of Edwards AFB, as well as time driving from the entrance gates to TRACON to report to work, time driving from TRACON to the exit gates at the end of work, time spent submitting to mandatory vehicle inspections, and time involved with mandatory base gate closures.

For plaintiffs to enter Edwards AFB to report to work at the TRACON, they had to pass through one of three entrance gates: the North Gate, the South Gate, or the West Gate. Pls.' PFUF ¶¶ 19-20; Def.'s PFUF ¶ 6; *e.g.*, Pls.' App. 309, 24:8-24 (Dep. of Thomas A. Dina (Oct. 28, 2009) ("Dina Dep.")); Pls.' App. 293-94, 40:8-15, 43:5-8, 43:21-23 (Dep. of Susan Marmet (Sept. 30, 2009) ("Marmet Dep.")). A security check point was in place at each gate, where plaintiffs were required to produce their FAA identification badge, and sometimes a driver's license, for an Air Force security guard to inspect. Pls.' PFUF ¶¶ 29-30; Def.'s PFUF ¶ 9; *e.g.*, Pls.' App. 309-310, 24:25 to 25:14 (Dina Dep.). The process to pass through the check point typically took plaintiffs less than one minute. Def.'s PFUF ¶ 10; *e.g.*, Def.'s App. 120, 37:13-25 (Delgado Dep.). However, plaintiffs often had to wait in line before reaching the security check points, with the wait time varying, depending on the gate through which plaintiffs entered and the time of day. Pls.' PFUF ¶ 31; Def.'s PFUF ¶ 11; *e.g.*, Pls.' App. 312-313, 42:25 to 43:17 (Dina Dep.); Def.'s App. 60, 54:7-19 (Dep. of David Paul Whalen, Sr. (Oct. 1, 2009) ("Whalen Dep.")).[6]

---

[6]The parties agree that the wait time at the West Gate between 5:00 and 8:00 a.m. on weekdays typically lasted 10 to 25 minutes, and that the wait time at the North and South Gates during these same hours was typically shorter. *See* Def.'s PFUF ¶ 11; Pls.' Resp. to Def.'s PFUF ¶ 11; Def.'s App. 32, 43:5-16 (Dina Dep.) (stating that "the wait time at West Gate would be anywhere from 10 minutes to 25 minutes," and that the South Gate "is a little bit faster"); Def.'s App. 23, 70:15-22 (Marmet Dep.) (stating that there would be no line at the North Gate at 6:00 a.m., but a line of between 4 and 8 cars close to 7:00 a.m.); Def.'s App. 59-60, 53:6 to 54:19 (Whalen Dep.) (reporting a wait at North Gate to make 8:00 a.m. shift of approximately 2 to 3 minutes, though on rare occasions as long as 20 minutes); Def.'s App. 142, 35:6-20 (Dep. of Robert Allen Long (Oct. 27, 2009) ("Long Dep.")) (West Gate far more likely to have traffic than South Gate during 7:00 a.m. shift). During all other hours, defendant asserts that there was rarely a wait of more than 5 minutes at any gate, and usually less or no wait. *See* Def.'s PFUF ¶ 11 (citing, *e.g.*, Def.'s App. 60, 54:7-10 (Whalen Dep.) (experiencing wait time at North Gate only on the 8:00 a.m. shift); Def.'s App. 117, 33:9-24 (Delgado Dep.) (very rare to have a wait for shifts starting between 1:00 and 3:00 p.m.)). Plaintiffs aver that they had to wait in line during afternoon shifts between 3 to 10 minutes approximately 50 percent of the time. Pls.' Resp. to Def.'s PFUF ¶ 11; App. to Pls.' Resp. to Def.'s Cross-Mot. for Summary Judgment ("Pls.' Resp. App.") 18-19, 35:14 to 36:12 (Hambrick Dep.) (3 to 10 minute delays 50 percent of the time at South Gate at 3:00 p.m.).

After passing through one of the three gates, plaintiffs typically proceeded directly to TRACON, a distance of between 4.5 and 8.2 miles, depending upon which gate was used. Def.'s PFUF ¶ 12; Def.'s App. 95, 42:2-5 (Dep. of Fritz Sperling (Oct. 29, 2009) ("Sperling Dep.")); Def.'s Resp. to Pls.' PFUF ¶ 55; Pls.' App. 425-26, Interrogatory No. 12 (Def.'s Objections and Responses to Pls.' First Set of Interrogatories (June 11, 2009)). After their shift, plaintiffs could leave Edwards AFB by the same routes. Pls.' PFUF ¶ 54; Def.'s PFUF ¶ 22; e.g., Pls.' App. 108, 55:15-22 (Dep. of Joel Ortiz (Oct. 1, 2009) ("Ortiz Dep.")). However, plaintiffs were not required to proceed directly from the gates to TRACON and vice versa, but rather could use a variety of non-work-related facilities and amenities on base, such as parks, restaurants, a golf course, a theater, a credit union, a gas station, and a museum. Def.'s PFUF ¶¶ 13, 22; see, e.g., Def.'s App. 61-62, 56:24 to 57:23 (Whalen Dep.). Plaintiffs used these facilities on occasion, see Def.'s PFUF ¶ 13, but they are not seeking compensation for time spent driving to and from these facilities. See Pls.' Resp. to Def.'s PFUF ¶ 13. Some plaintiffs were subjected to security inspections at the exit gates, though such inspections were rare and plaintiffs typically drove straight through the exit gates without stopping. Pls.' PFUF ¶ 24; Def.'s PFUF ¶ 22; Pls.' App. 073-74, 42:25 to 43:4 (Long Dep.) (reporting being stopped for an inspection at an exit gate once or twice); Def.'s App. 7-8, 93:20 to 94:14 (Dep. of Mark Heinrich (Sep. 29, 2009) ("Heinrich Dep.")) (describing driving straight through exit gates unless stopped for a vehicle inspection); Def.'s App. 22, 68:2-4 (Marmet Dep.) (reporting never being searched or stopped for a security check at the exit gates).

Security guards at Edwards AFB occasionally subjected plaintiffs to random vehicle inspections at the entrance and exit gates or elsewhere on the base. Pls.' PFUF ¶ 33; Def.'s PFUF ¶ 28. On average, plaintiffs were subjected to approximately two vehicle inspections per year. Def.'s PFUF ¶ 29; e.g., Def.'s App. 91, 93-94, 36:12-16, 40:18-21, 41:6-9 (Sperling Dep.) (testifying to six vehicle inspections in five years).[7]

On occasion, plaintiffs were unable to leave the base for a time because Air Force security personnel closed the exit gates to prevent people from leaving while investigating an

---

[7]The parties dispute the length of these inspections. Compare Pl.'s PFUF ¶ 35 ("On average, a vehicle inspection takes 10 to 20 minutes.") (citing Pls.' App. 319, 53:15-20 (Dina Dep.) (10 or 15 minutes); Pls.' App. 015, 38:7-13 (Delgado Dep.) (10 minutes); Pls.' App. 045, 48:9-20 (Hambrick Dep.) (6 to 10 minutes); Pls.' App. 073, 42:7-11 (Long Dep.) (10 minutes); Pls.' App. 111, 59:11-19 (Ortiz Dep.) (15 to 20 minutes); Pls.' App. 132-133, 51:24 to 52:9 (Dep. of David P. Schmidt (Oct. 26, 2009) ("Schmidt Dep.")) (5 to 15 minutes); Pls.' App. 199, 38:5-7 (Sperling Dep.) (10 to 15 minutes); Pls.' App. 231, 43:11-12 (Dep. of Gregory Turner (Oct. 27, 2009) ("Turner Dep.")) (3 to 5 minutes); Pls.' App. 250, 64:11-15 (Whalen Dep.) (no more than 15 minutes); Pls.' App. 343, ¶ 12 (Decl. of John E. Burns (Dec. 8, 2009) ("Burns Decl.")) (10 to 15 minutes); Pls.' App. 352, ¶ 9 (Decl. of Steven S. Landon (Dec. 11, 2009) ("Landon Decl.")) (15 to 20 minutes)); with Def.'s Response to Pls.' PFUF ¶ 35 ("Some plaintiffs testified that vehicle inspections sometimes delayed them less than 10 minutes. The facility manager at TRACON estimated that vehicle inspections last three to five minutes.") (citing Def.'s App. 6, 91:20-22 (Heinrich Dep.) (3 to 5 minutes)).

incident on the base. Pls.' PFUF ¶¶ 38-39; Def.'s PFUF ¶ 23; Pls.' App. 323-324, 65:14-19, 67:1-4 (Dina Dep.).[8]  The parties disagree about the average duration of these gate closures, *compare* Pls.' PFUF ¶ 42 ("These gate closures can last, on average, an hour to an hour and a half."), *with* Def.'s Resp. to Pls.' PFUF ¶ 42 ("While . . . plaintiffs may sometimes be delayed by more than an hour, the average is far less than an hour to an hour and a half."), which according to deposition testimony lasted for as short as five minutes or as long as two hours. *See, e.g.*, Def.'s App. 39, 69:6-8 (Dina Dep.) (average amount of time of gate closure between 5 and 30 minutes); Def.'s App. 65-66, 68:25 to 70:8 (Whalen Dep.) (lockdowns averaged between 45 minutes to an hour, with the shortest time being approximately 15 minutes and the longest in excess of 2 hours).  Plaintiffs were delayed by gate closures approximately one or two times per year, on average.  Def.'s PFUF ¶ 25; *e.g.*, Def.'s App. 64-65, 68:20 to 69:3 (Whalen Dep.).

The FAA compensated plaintiffs for time it considered them to be on duty.  Pls.' PFUF ¶ 46; Pls.' App. 411-412, Request for Admission No. 48 (Def.'s Objections and Responses to Pls.' Second Request for Admissions).  That time on duty was measured by the "Cru-X/ART" time-keeping system, which the FAA employed for plaintiffs to log in and out for each work day at TRACON.  Pls.' PFUF ¶ 47; Pls.' App. 283-284, 96:22 to 97:7 (Heinrich Dep.); Pls.' App. 292, 38:10-14 (Marmet Dep.).  An ATCS who began his or her shift at TRACON would sign in the Cru-X/ART on a computer in the TRACON control room, Def.'s PFUF ¶ 15; Def.'s App. 84, 21:13-20 (Sperling Dep.); Def.'s App. 113, 21:6-13 (Delgado Dep.), at which point he or she would be considered to be on duty.  Pls.' PFUF ¶ 48; Def.'s PFUF ¶ 17; Pls.' App. 411-412, Request for Admission No. 46 (Def.'s Objections and Responses to Pls.' Second Request for Admissions).  Once an ATCS clocked out of the Cru-X/ART at the end of his or her shift, he or she was considered off duty.  Pls.' PFUF ¶ 49; Def.'s PFUF ¶ 21; Pls.' App. 286, 99:20-22 (Heinrich Dep.).[9]

Plaintiffs generally were not compensated for time spent in security inspections at the entrance and exit gates to Edwards AFB, nor were they paid for time spent during vehicle inspections, for time traveling to or from the entrance gates at Edwards AFB prior to or at the end

---

[8]The parties disagree as to whether entrance gates were also shut down.  Plaintiffs allege that during mandatory gate closures, all entrance and exit gates were shut down.  *See* Pls.' PFUF ¶ 38 (citing, *e.g.*, Pls.' App. 049, 52:5-11 (Hambrick Dep.) (describing gate closures as "nobody in, nobody out"); Pls.' App. 114, 67:15-17 (Ortiz Dep.) (stopped from entering Edwards AFB three times because of a lockdown)).  Defendant asserts that "[u]sually, it is only the exit gates that are shut down."  Def.'s Resp. to Pls.' PFUF ¶ 38 (citing Def.'s App. 10-11, 100:5 to 101:1 (Henrich Dep.) (no recollection of individuals being prevented from entering Edwards AFB, but aware of three instances were individuals were prevented from leaving); Def.'s App. 38, 65:14-20 (Dina Dep.) (describing purpose of gate closure as to ensure that nobody leaves the base)).

[9]Plaintiffs were permitted to sign out up to 15 minutes prior to the end of their shift, but were required to remain at TRACON until the end of their shift, at which point they were considered to be off duty and were free to leave TRACON.  Def.'s PFUF ¶ 21; Def.'s App. 19-20 63:2-12, 66:3-20 (Marmet Dep.).

of their shifts, or for time spent waiting to leave the base as a result of base closures.  *See* Pls.' PFUF ¶¶ 50-52, 56-57; *e.g.*, Pls.' App. 251, 65:3-22 (Whalen Dep.); Pls.' App. 396, Request for Admissions No. 34 (Def.'s Objections and Responses to Pls.' First Request for Admissions); Pls.' App. 336, ¶¶ 7-9 (Decl. of Joseph G. Blanco (Dec. 9, 2009) ("Blanco Decl.")).[10]

### C. Medical Examinations

As ATCSs with the FAA at TRACON from October 1, 2004 to the present, plaintiffs were required to obtain mandatory medical clearances as a condition of employment.  Pls.' PFUF ¶ 58; Def.'s PFUF ¶ 32; Pls.' App. 397, Request for Admission No. 36 (Def.'s Objections and Responses to Pls.' First Request for Admissions).  To obtain their mandatory medical clearances, plaintiffs had to pass an FAA-mandated physical examination every one or two years, depending on their age, or obtain a waiver of the medical standards with special consideration.  Pls.' PFUF ¶¶ 59-60; Def.'s PFUF ¶¶ 33-34; Pls.' App. 297-298, 9:16 to 10:4; 300-301, 14:24 to 16:4 (Dep. of Stephen W. Griswold, M.D., Flight Surgeon (Sept. 29, 2009) ("Griswold Dep.")); Def.'s App. 46, 11:4-22 (Griswold Dep.); Pls.' App. 028, 54:18-20 (Delgado Dep.); Pls.' App. 063, 82:20-22 (Hambrick Dep.); Pls.' App. 145-48, 78:9-19, 81:2-25, 89:23 to 90:6 (Schmidt Dep.); Pls'. App. 185-186, 71:2 to 72:6 (Dep. of Lawrence John Shinar (Oct. 28, 2009) ("Shinar Dep.")).  If plaintiffs did not obtain their medical clearance or a waiver based upon special consideration, they could not perform their operational job duties as ATCSs for the FAA at TRACON, although they might be assigned to perform administrative duties.  Pls.' PFUF ¶ 61; Def.'s PFUF ¶ 34; Pls.' App. 302-03, 16:23 to 17:17 (Griswold Dep.).

The plaintiffs' annual or bi-annual physical examinations were scheduled by the FAA at its Los Angeles Medical Field Office ("Los Angeles Center") in Palmdale, California, and plaintiffs were not given a choice regarding the date or time of the examinations.  Pls.' PFUF ¶ 62; Def.'s PFUF ¶ 33; Pls.' App. 299, 12:3-12 (Griswold Dep.); Pls.' App. 184, 66:10-18 (Shinar Dep.); Def.'s App. 73-74, 82:2 to 83:4 (Whalen Dep.).  These examinations generally occurred at the beginning or ending of plaintiffs' shifts, and plaintiffs were on duty while they

---

[10]The government agrees that plaintiffs were not compensated for these periods of time as a general matter, but it points to a number of exceptions where plaintiffs could be and were compensated.  Plaintiffs were sometimes given excused leave for an unusual delay in arriving at work.  *See* Def.'s Resp. to Pls.' PFUF ¶¶ 50-51 (citing Def.'s App. 70-72, 77:18 to 79:19 (Whalen Dep.) (describing being granted leave on two occasions because of unexpected road closures off base); Def.'s App. 92, 39:3-17 (Sperling Dep.) (describing once being granted 15 minutes of excused leave for a delay at the gates); Def.'s App. 197-198, 59:20 to 60:17 (Ortiz Dep.) (describing being granted 15 minutes of excused leave for vehicle inspections on three occasions)).  Also, plaintiffs traveling to an FAA-scheduled medical appointment from TRACON or from an FAA-scheduled medical appointment to TRACON were paid for their travel, including time spent with security inspections at the gate, any vehicle inspection, and any base gate closure.  Def.'s Resp. to Pls.' PFUF ¶¶ 50-52, 56-57; Def.'s App. 74, 83:9-17 (Whalen Dep.); Def.'s App. 103-104, 55:15 to 56:9 (Sperling Dep.); Def.'s App. 130-131, 132, 56:5 to 57:11, 62:21-25 (Delgado Dep.).

were at the Los Angeles Center. *See, e.g.*, Def.'s App. 74, 83:9-24 (Whalen Dep.). Accordingly, plaintiffs were paid for the time spent attending their annual or bi-annual physical examination provided (and required) by the FAA, as well as any time spent traveling between the examination site and TRACON, but were not paid for time spent traveling between the examination site and their home. Def.'s PFUF ¶ 33; Pls.' PFUF ¶ 69; Def.'s App. 74, 83:9-24 (Whalen Dep.); *e.g.*, Def.'s App. 103-104, 55:15 to 56:12 (Sperling Dep.).[11]

ATCSs who failed to meet the FAA's medical standards at their physical examination were provided with a memorandum listing the standards they failed to satisfy and describing the medical documentation the FAA anticipated it would need to assess whether the ATCSs could obtain a waiver of the medical standards, *i.e.*, special consideration. Def.'s PFUF ¶ 35; Def.'s App. 51, 36:2-23 (Griswold Dep.). To obtain these waivers, ATCSs often needed to acquire additional test results and reports from their own private physicians. Def.'s PFUF ¶ 36; Def.'s App. 47-49, 14:24 to 16:22 (Griswold Dep.). The FAA did not compensate ATCSs for time spent obtaining these additional test results and reports. Pls.' PFUF ¶ 67; Pls.' App. 267, 103:8-10 (Whalen Dep.); Pls.' App. 344, ¶ 16 (Burns Decl.); Pls.' App. 353, ¶ 13 (Landon Decl.).

## STANDARDS FOR DECISION

Summary judgment is appropriate if the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). An issue is "genuine" if it "may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. A fact is "material" if it might affect the outcome of the case. *Id.* at 248. When deciding these issues, courts view all inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). In disposing of cross-motions for summary judgment, courts evaluate each motion on its own merits and resolve any reasonable inferences against the moving party. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). Denial of both motions is warranted if genuine disputes exist over material facts. *Id.* Where a party bases its motion for summary judgment on the "absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the adverse party then "must set forth specific facts showing that there is a genuine issue for trial." RCFC 56(e).

Plaintiffs bear the burden of proof and persuasion. *See Abbey v. United States*, 82 Fed. Cl. 722, 727 (2008) ("To prevail on a FLSA claim for an overtime activity suffered or permitted to be performed, plaintiffs must carry their burden of proof on all of the elements of the particular claim.") (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946)).

_____

[11]For example, if an ATCS were scheduled for a physical examination at the beginning of his shift, he or she would be off duty while driving from his home to the Los Angeles Center, but then would be on duty during the examination and during the drive from the Center to TRACON. Def.'s App. 103-104, 55:15 to 56:12 (Sperling Dep.).

## ANALYSIS

The FLSA requires that an employer pay overtime compensation when it employs a non-exempt employee for a workweek exceeding forty hours. 29 U.S.C. §§ 207(a), 213(a)(1). Plaintiffs' claims for money damages turn on whether the activities at issue constitute "work" within the meaning of the FLSA.  The Act does not define "work," *see* 29 U.S.C. § 203 (Definitions), but it uses the word in context as part of key provisions. *See, e.g.*, 29 U.S.C. § 203(g) ("'Employ' includes to suffer or permit to work."). The Supreme Court's early cases construed the term "work" broadly as activity "controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944).  Later, the Supreme Court construed the statutory term "workweek," used in 29 U.S.C. § 207(a)(1), to refer to overtime paid "at a rate not less than one and one-half times the regular rate," to "include all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace." *Mt. Clemens Pottery*, 328 U.S. at 690-92 (concluding that "work" included time spent by employees walking from timeclocks near a factory entrance gate to their workstations).

The Portal-to-Portal Act of 1947, Pub. L. No. 80-49, 61 Stat. 84, modified these broad interpretations by excluding from FLSA liability such activities as

> walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is asked to perform, and . . . activities which are preliminary to or postliminary to said principal activity or activities.

29 U.S.C. § 254(a); *see also IBP, Inc. v. Alvarez*, 546 U.S. 21, 25 (2005) (describing history of the FLSA and the Portal-to-Portal Act); *Adams v. United States*, 471 F.3d 1321, 1324-25 (Fed. Cir. 2006) (same, preparatory to addressing and rejecting a claim for compensation under the FLSA for time spent solely in driving a government vehicle between home and work).  After enactment of the Portal-to-Portal Act, the Supreme Court clarified that activities performed by an employee "before or after the regular work shift" that are "an integral and indispensable part of the principal activities" of the employee are themselves "principal activities" and, thus, are not excluded from FLSA coverage by the Portal-to-Portal Act. *Steiner v. Mitchell*, 350 U.S. 247, 253, 256 (1956).  For the time involved to be compensable under the FLSA, claiming plaintiffs bear the burden of proving that the activities at issue are an integral and indispensable part of their principal activities and not merely activities that are preliminary or postliminary to their principal activities, such as commuting to work. *Adams*, 471 F.3d at 1326.

## I. CREDIT HOURS

Plaintiffs contend that the FAA contravened the provisions of the FLSA when it compensated plaintiffs for time worked beyond their normal work schedule in the form of credit hours as contrasted to time-and-a-half pay for overtime work. Pls.' Mot. at 10-13.  Under the

FAA's personnel management system, FAA employees who work on a flexible work schedule, such as plaintiffs, could elect to work beyond their normal workweek in exchange for credit hours at a one-to-one ratio, which they could then exchange for paid leave.  *See* Def.'s App. 394 (FAA Personnel Management System (Mar. 28, 1996)).  To support their motion, plaintiffs rely primarily on *Abbey*, 82 Fed. Cl. at 728-45, a decision granting summary judgment in favor of air traffic controllers raising a credit-hour claim on grounds essentially the same as those put forward here.  Pls.' Mot. at 12-13.  The government asserts that the FAA was permitted by law to compensate plaintiffs with credit hours as part of its personnel management system, which was adopted in response to Congressional directive.  Def.'s Cross-Mot. for Summary Judgment and Resp. to Pls.' Mot. at 28-30 ("Def.'s Cross-Mot.").  The government also disputes the applicability of *Abbey*.  *Id*. at 31.

### A. Collateral Estoppel

A threshold issue raised by plaintiffs is whether the government is collaterally estopped from litigating the credit-hour issue as a result of the decision in *Abbey*.  Pls.' Reply at 1-2.  The court in *Abbey* ruled that the government's "payment of hour-for-hour compensatory time and credit hours violates the FLSA requirement that overtime compensation be paid at 'one and one-half times' the employee's regular rate of pay."  82 Fed. Cl. at 745 (quoting 29 U.S.C. § 207(a)(1)).  Collateral estoppel is applied when "a judgment on the merits in the first suit precludes relitigation in a second suit of issues actually litigated and determined in the first suit." *Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1334 (Fed. Cir. 2001).  Here, plaintiffs seek to use collateral estoppel offensively against the government because plaintiffs are seeking to prevent the government from relitigating defenses to plaintiffs' claim.  In addition, plaintiffs are invoking collateral estoppel in the absence of mutuality of parties.[12]

Plaintiffs' attempted invocation of the doctrine of collateral estoppel fails on fundamental grounds.  The Supreme Court has explicitly held that "nonmutual offensive collateral estoppel simply does not apply against the [federal] government."  *United States v. Mendoza*, 464 U.S. 154, 162 (1984).  Indeed, "[a] rule allowing nonmutual collateral estoppel against the government in such cases would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue."  *Id*. at 160.  This limiting principle applies when collateral estoppel is used offensively in the absence of mutuality of parties.  By comparison, the government remains subject to collateral estoppel when the doctrine is put forward as a defense against governmental claims where there is mutuality of the parties and a related subject matter, even respecting issues of law.  *See United States v. Stauffer Chem. Co.*, 464 U.S. 165, 173 (1984).  Both conceptually and pragmatically, *Mendoza* and *Stauffer Chemical* are fully consistent with each other.  *See Burlington Northern R.R. v. Hyundai Merchant Marine Co.*, 63 F.3d 1227, 1235-37 (3d Cir. 1995); *see also* 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4425, at 633-65 (2002) (discussing *Stauffer Chemical*); 18A *Federal Practice and Procedure* § 4-465.4, at 796-

---

[12]Four of the plaintiffs were initially plaintiffs in *Abbey*, but withdrew from *Abbey* to join this action.

804 (addressing *Mendoza*).  Indeed, the two cases were decided by the Supreme Court on the same day.  Here, because *Mendoza* and not *Stauffer Chemical* governs the circumstances at hand, the government is not collaterally estopped from again litigating the credit-hour issue.

## B. The Legislative Predicates for the FAA's Personnel Management System

The credit-hour issue is complex because it has its roots in the legal bases for the FAA's compensation structure, which are derived in relevant part from the FLSA, the FAA's personnel management system, the several statutes underpinning that system, and any applicable collective bargaining agreement.  As noted previously, the FLSA requires employers to provide overtime compensation to non-exempt employees who work in excess of forty hours per week at a rate not less than one and one-half times the employee's regular rate of pay.  29 U.S.C. § 207(a)(1).[13] ATCSs such as plaintiffs are non-exempt employees pursuant to the FLSA.  *See* Pls.' PFUF ¶ 3; Pls.' App. 285-86, 98:17 to 99:6 (Heinrich Dep.).  However, in 1982, Congress adopted the Federal Employees Flexible and Compressed Work Schedules Act of 1982 ("Flexible Schedules Act"), Pub. L. No. 97-221, 96 Stat. 227 (1982) (codified as amended at 5 U.S.C. §§ 6120-6133), which "provide[d] permanent authorization for [f]ederal agencies to use flexible and compressed employee work schedules."  96 Stat. at 227 (description of Act).  This included authorization for federal agencies to use credit hours or compensatory time off to compensate their employees for time worked beyond their normal work schedule instead of the time-and-a-half overtime mandated by the FLSA.  *See* 96 Stat. at 228 (codified as amended at 5 U.S.C. § 6122).  Thus, federal agencies may generally use a credit-hour system that operates upon a request for such hours by a federal employee which is then approved by the agency.

The credit-hour issue for the FAA is different from that for most federal agencies, however, because the FAA uses an atypical personnel system.  In 1996, Congress authorized the FAA to implement a "personnel management system" that provided "greater flexibility in . . . compensation," while stating that "the provisions of title 5, United States Code, shall not apply to the new personnel management system."  Department of Transportation and Related Agencies Appropriation Act of 1996 ("1996 Appropriations Act"), Pub. L. No. 104-50, § 347, 109 Stat. 436. 460 (1996) (later codified as amended at 49 U.S.C. § 40122(g)).  In developing the personnel management system, the FAA administrator was authorized to fix the compensation of its employees and not "be bound by any requirement to establish such compensation or benefits at particular levels," except as provided in § 40122(a) and (g).  Federal Aviation Reauthorization Act of 1996 ("1996 Reauthorization Act"), Pub. L. No. 104-264, § 225, 110 Stat. 3213, 3232 (1996) (codified as amended at 49 U.S.C. § 106(*l*)(1)).

The parties urge the court to follow two different methods of statutory construction in determining the FAA's ability to use portions of Title 5 in its personnel management system. Plaintiffs argue that the court should adhere to the maxim *expressio unius est exclusio alterius*

---

[13]FLSA's requirements were extended to federal agencies in 1974 by the Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, 88 Stat. 55 (codified as amended at 29 U.S.C. § 203(e)(2)).

11

and deny the FAA authority to incorporate the credit-hour provisions of Title 5 into its personnel management system because the text of 49 U.S.C. § 40122(g)(2) states that "the provisions of title 5 shall not apply" to the personnel management system, with exceptions not pertinent here. Pls.' Reply at 5-6.  Specifically, the listed exceptions expressly retaining particular provisions of Title 5 do not include the allowance for compensation with credit hours.  As plaintiffs would have it, "[i]f Congress intended for the title 5 FLSA exceptions to be included in the FAA's new Personnel Management System, it would have enumerated those specific provisions in 49 U.S.C. § 40122(g)(2)."  *Id.* at 6.  This is essentially the position adopted in *Abbey*:

> While it is true that § 5543 of title 5 of the United States Code authorizes the payment of compensatory time at a straight time rate for irregular or unscheduled overtime worked by certain federal employees, 5 U.S.C. § 5543, and 5 U.S.C. §§ 6120-33 allows compensatory time to be granted for hours worked beyond an employee's flextime schedule, *id.* §§ 6120-33, none of these provisions applies to plaintiffs because none of these provisions is listed among the exceptions to the express provision of 49 U.S.C. § 40122(g)(2) that "[t]he provisions of title 5 shall not apply to [the FAA's] new personnel management system."  49 U.S.C. § 40122(g)(2).

82 Fed. Cl. at 731-32.  The government, on the other hand, emphasizes the greater flexibility given to the FAA for its personnel management system via 49 U.S.C. §§ 106(*l*)(1) and 40122(g)(1).  Def.'s Cross-Mot. at 31.  It argues that the FAA may in its discretion adopt provisions of Title 5 that provide flexibility, such as the credit-hour authorization provided by 5 U.S.C. § 6122.  *Id.*

In analyzing these competing positions, the court will look to the text and context of the statutes authorizing the FAA's personnel management system, including other sections besides Sections 106(*l*)(1) and 40122(g)(2).  As the Supreme Court has directed, "[i]n determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation.  The meaning – or ambiguity – of certain words or phrases may only become evident when placed in context."  *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000) (citation omitted).

In 1982, the Flexible Schedules Act made permanent a temporary experimental program that tested the effectiveness of using flexible or compressed work schedules in government agencies and included the use of credit hours and compensatory time off as compensation options.  *See* 5 U.S.C. §§ 6120-6133.  The experimental program was hailed as a great benefit to both the agencies and their employees and, consequently, was found to be an appropriate program to continue.  *See* 5 U.S.C. § 6120 ("The Congress finds that the use of flexible and compressed work schedules has the potential to improve productivity in the [f]ederal [g]overnment and provide greater service to the public."); *see also* 128 Cong. Rec. 15,795 (1982) (statement of Rep. Hoyer) (stating that the programs have "proven to be morale boosters and have helped increase productivity" among the workers); 128 Cong. Rec. 16,053 (1982)

(statement of Rep. Wolf) (stating that the program has "led to greater efficiency in [g]overnment"). According to a Senate Government Affairs Committee report that accompanied the bill that became the Flexible Schedules Act, a primary purpose of that Act was to give agencies options in employee scheduling that would enable them to more effectively and efficiently accomplish their functions. S. Rep. No. 97-365, at 566 (1982) ("If government managers find that their unit's mission is not being effectively accomplished due to [the] scheduling arrangements of their employees, they need the flexibility to alter these arrangements within the confines of certain basic employee protections."). Under the Act, agencies were permitted to establish schedules that included "designated hours during which an employee on such a schedule may elect the time of such employee's arrival at and departure from work, solely for such purpose or, if and to the extent permitted, for the purpose of accumulating credit hours to reduce the length of the workweek or another workday." 5 U.S.C. § 6122(a)(2). In particular, "the head of an agency may, on request of the employee, grant the employee compensatory time off in lieu of payment for such overtime hours, whether or not irregular or occasional in nature and notwithstanding the provisions of . . . section 7 of the [FLSA] (29 U.S.C. [§] 207), or any other provision of law." 5 U.S.C. § 6123(a)(1). This waiver of FLSA provisions included 29 U.S.C. § 207(a)(1), which mandated time-and-a-half overtime compensation. According to a Senate Report accompanying the bill that became the Flexible Schedules Act, the waiver provisions were to effectuate Congress' intent to permit "liberal use of compensatory time off" and credit hours when an employer and employee agreed upon such use, despite the provisions of the FLSA regarding overtime compensation. S. Rep. No. 97-365, at 571 (1982).

Flexibility was also the keystone of the 1996 Appropriations Act which authorized the FAA to implement its own personnel management system. *See* Section 374 of the Act, 109 Stat. at 460 (codified at 49 U.S.C. § 40122(g)(1) (providing the FAA with "greater flexibility in the hiring, training, compensation, and location of [its] personnel.")). The creation of the FAA's personnel management system was the culmination of extensive hearings on proposals to reform the operations of the FAA. Among other things, Congress acted to "exempt[ ] the [FAA] from current procurement and personnel laws *that hinder its flexibility*." H.R. Rep. 104-475, pt .1, at 31 (1996) (emphasis added). Congress considered that the FAA was too constrained by the current system and needed more freedom in its personnel management than it had at the time. *See* 141 Cong. Rec. 22,900 (1995) (statement of Sen. Hatfield) ("[E]xisting governmental personnel . . . rules serve as a straitjacket at FAA.") (quoting from the Airport Report published by the American Association of Airport Executives). As a result, the 1996 Appropriations Act provided that "[t]he provisions of title 5, United States Code, shall not apply to the new personnel management system," with the exception of a few provisions relating to core employee protections, including those pertaining to whistleblower protection, antidiscrimination restrictions, and workers' compensation. Section 347 of the Act, 109 Stat. at 460 (later codified at 49 U.S.C. § 40122(g)(2)).

During the Congressional debate on the bills that became the 1996 Appropriations Act, the waiver of Title 5 applicability was initially a cause for concern on the part of some members of Congress, who considered that the bill was going too far in its grant of flexibility and freedom to the FAA and that the Title 5 waiver would leave workers vulnerable. *Compare* 141 Cong.

Rec. 29,362 (1995) (statement of Rep. Coleman) (questioning the wisdom of the waiver), and *id.* at 29,363 (statement of Rep. Obey) ("I think all of us wanted to give the FAA the ability to reorganize its shop, but I want to say that I think that a number of us have concerns about the lack of protections which we feel are in this bill for workers' rights during that reorganization process."), *with id.* (statement of Rep. Lightfoot) ("The personnel . . . reforms we have put in place will save taxpayers' money, [and] at the same time accelerate the modernization of the FAA and drag them out of the 1950s into the 1990s.").  Importantly, the concern was that the FAA would be able to ignore, as opposed to adopt or follow, provisions of Title 5 in creating its personnel management system.  *See*, *e.g.*, 141 Cong. Rec. 22,896 (1995) (statement of Sen. Glenn) (expressing support for the Roth Amendment, which would have stricken the waiver of Title 5 and restored its applicability to the personnel management system to maintain worker protections).[14]  Nevertheless, the waiver of Title 5 remained in the bill and Congress chose to provide limited exceptions to the waiver that preserved specific employee protections.  *See* 49 U.S.C. § 40122(g)(2).[15]  Sections 5543 and 6123 of Title 5, relating to the credit-hour system, were not among those sections listed in the exceptions set out in Section 347 of the 1996 Appropriations Act, nor have they since been added.  49 U.S.C. § 40122(g)(2).

---

[14]The Roth Amendment was tabled.  Its description can be found at 141 Cong. Rec. 22,947 (1995).

[15]In full, Section 347 of the 1996 Appropriations Act provided as follows:
  (a) In consultation with the employees of the Federal Aviation Administration and such non-governmental experts in personnel management systems as he may employ, and notwithstanding the provisions of title 5, United States Code, and other Federal personnel laws, the Administrator of the Federal Aviation Administration shall develop and implement, not later than January 1, 1996, a personnel management system for the Federal Aviation Administration that addresses the unique demands on the agency's workforce. Such a new system shall, at a minimum, provide for greater flexibility in the hiring, training, compensation, and location of personnel.
  (b) The provisions of title 5, United States code, shall not apply to the new personnel management system developed and implemented pursuant to sub-section (a), with the exception of –
    (1) section 2302(b), relating to whistleblower protection;
    (2) sections 3308-3320, relating to veterans' preference;
    (3) section 7116(b)(7), relating to limitations on the right to strike;
    (4) section 7204, relating to antidiscrimination;
    (5) chapter 73, relating to suitability, security, and conduct;
    (6) chapter 81, relating to compensation for work injury; and
    (7) chapters 83-85, 87, and 89, relating to retirement, unemployment compensation, and insurance coverage.
    (c) this section shall take effect on April 1, 1996.
109 Stat. at 460 (*see* 49 U.S.C. § 106 note).

Section 347 of the Appropriations Act was not immediately codified as part of Title 49. And, although Section 40122 of Title 49 was created later in 1996 as part of the 1996 Reauthorization Act, *see* Pub. L. No. 104-264, § 253, 110 Stat. at 3237, that Section then did not then include what is now Subsection (g) of Section 40122, which currently contains the text of the 1996 Appropriations Act that directed the FAA to establish the personnel management system and described the interaction between that system and Title 5. Thus, Section 347 of the 1996 Appropriations Act, uncodified, remained the source of the FAA's authority to implement a personnel management system until Congress passed the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, Pub. L. No. 106-181, § 307, 114 Stat. 61, 124 (2000), which incorporated the language of Section 347 of the 1996 Appropriations Act as Subsection (g) of Section 40122.

Nonetheless, the 1996 Reauthorization Act is helpful in providing context for Congress' intent regarding the meaning of "greater flexibility" as used in Section 347 of the 1996 Appropriations Act. The 1996 Reauthorization Act explicitly cited Section 347 in authorizing the FAA Administrator to "fix the compensation of [the FAA's] officers and employees" as part of the new personnel management system. Section 225 of the Act, 110 Stat. at 3232 (codified at 49 U.S.C. § 106(*l*)(1)).[16] FAA personnel management flexibility and resource constraints were intertwined with the safety issues that seemed to dominate the Congressional hearings. *See* S. Rep. No. 104-333, at 5, 9 (1996).[17] In particular, the last clause of Section 106(*l*)(1) as adopted

---

[16]As initially enacted via Section 225 of the 1996 Reauthorization Act, 49 U.S.C. § 106(*l*)(1) provided:

> (*l*) PERSONNEL AND SERVICES. –
>
>    (1) OFFICERS AND EMPLOYEES. – *Except as provided in* section 40122(a) of this title and *section 347 of Public Law 104-50, the Administrator is authorized*, in the performance of the functions of the Administrator, *to* appoint, transfer, and *fix the compensation of such officers and employees*, including attorneys, *as may be necessary to carry out the functions of the Administrator and the Administration*. In fixing compensation and benefits of officers and employees, the Administrator shall not engage in any type of bargaining, except to the extent provided for in section 40122(a), nor shall the Administrator be bound by any requirement to establish such compensation or benefits at particular levels.

110 Stat. at 3232 (adopting the provision codified as 49 U.S.C. § 106(*l*)(1)) (emphasis added).

[17]Congress viewed personnel management flexibility and safety as intimately related and not as separate issues. For example, Senator McCain commentated: "I have long been a strong supporter of comprehensive FAA reform, which includes helping to create a more autonomous and accountable FAA, giving the FAA flexibility in personnel . . . matters . . . ensuring that the FAA has a long-term . . . funding system that considers the FAA's costs of providing services, increases the efficiency with which the FAA provides its services, and enhances the safety of the U.S. air transportation system." 142 Cong. Rec. 23,350 (1996) (statement of Sen. McCain).

in 1996 specifies that the FAA shall not "be bound by any requirement to establish such compensation or benefits at particular levels." Section 225 of the Act, 110 Stat. at 3232 (codified at 49 U.S.C. § 106(*l*)(1)). That language remains unchanged. Moreover, the legislative history related to the 1996 Reauthorization Act indicates that the FAA was being given permission to waive "many federal laws and regulations in the areas of personnel and procurement that inhibit the effectiveness of FAA." S. Rep. No. 104-251, at 11 (1996).

This as-enacted regime for the FAA's then-new personnel management system stands in contrast to a provision put forward in a bill approved by the Senate Commerce, Science & Transportation Committee that would have included language in Section 106(*l*)(1) specifically requiring the FAA to "compensate [its officers] in accordance with title 5." S. Rep. No. 104-333, at 52 (1996). However, in acting on the House-passed bill that became the 1996 Reauthorization Act, the Senate did not adopt that committee-approved language but rather retained the House language that emphasized that Section 347 of the 1996 Appropriations Act would apply to the personnel management system, including the waiver of Title 5 applicability with listed exceptions. *See* 142 Cong. Rec. 23,626 (1996). In short, the House version addressed specifically at H.R. Rep. No. 104-848, at 21 (1996), reflected the language eventually adopted in the 1996 Reauthorization Act. *See* H.R. Rep. No. 104-818 (1996) (conference report); 142 Cong. Rec. 27,158 (1996) (Senate's adoption of conference report).

In addition, Section 347 contained, and 49 U.S.C. § 40122(g)(1) now contains, the prescription that the personnel management system shall be developed "notwithstanding . . . other [f]ederal personnel laws." By ordinary usage, the FLSA would be deemed a federal personnel law, at least after the adoption in 1974 of the Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, extending the FLSA's requirements to federal executive agencies. *See*, *supra*, at 11 n.13; *see also* 29 U.S.C. § 203(e)(2)(A)(ii) (defining an "employee" to mean an individual employed by the federal government "in any executive agency (as defined in [S]ection 105 of [Title 5]")). The "notwithstanding" clause thus indicates that the FLSA is superseded, insofar as its requirements might be in conflict with the FAA's personnel management system. *See Marcello v. Bonds*, 349 U.S. 302, 310-11 (1955) (finding the inclusion of the phrase "[n]otwithstanding the provisions of any other law" in drafts of a bill enough to show the intent of Congress to supersede Section 5(c) of the Administrative Procedure Act even though the final bill deleted the language); *see also Lockhart v. United States*, 546 U.S. 142, 144 (2005) (finding that the time limitations for offsetting certain loans were superseded by including the phrase "[n]otwithstanding any other provision of statute" in the Higher Education Technical Amendments).

This conclusion contrasts with that in *Abbey*, where the court stated:

There is an absence in either the text of the legislation or in the legislative history of § 106(*l*)(1) of a clearly discernable indication of congressional intent to abrogate the protections of the FLSA. The statute lacks a phrase such as '[n]otwithstanding any other provision of the law,' a phrase which has been interpreted to 'connote[ ] a legislative intent to displace any other provision of law that is contrary to the Act.' *Shoshone Indian*

16

*Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339, 1346 (Fed. Cir. 2004).

82 Fed. Cl. at 736. *Abbey* held that neither Section 106(*l*)(1) nor Section 40122(g)(1) gave the FAA authority to supersede the FLSA because the legislative history did not affirmatively support a waiver of the FLSA's applicability to the FAA. *Id.* at 738. In addition, the court in *Abbey* found that the FAA did not have discretion to adopt portions of Title 5 for the personnel management system because Section 40122(g)(2) specified that "[t]he provisions of title 5 shall not apply to the new personnel management system," with limited exceptions. *Id.* at 731 (citing § 40122(g)(2)). This case implicates the overtime provisions of the FLSA, as measured against the credit-hour provisions of the FAA's personnel management system. The decision in *Abbey* was correct that Section 106(*l*)(1) was bereft of any excepting "notwithstanding" clause, but the presence of such a clause in the companion provision, Section 347 of the 1996 Appropriations Act, to which Section 106(*l*)(1) made explicit reference, supplies the necessary text. The concluding "notwithstanding" clause of Section 347 of the 1996 Appropriations Act, later codified as part of Section 40122(g)(1), provides strong and compelling evidence that the FAA's adoption of a credit-hour arrangement in its personnel management system trumps anything in the FLSA to the contrary.

In this vein, much like the 1982 Flexible Schedules Act, which allowed federal agencies to use flexible and compressed work schedules as well as offer credit hours in lieu of payment for overtime in order to improve the efficiency of federal agencies, the 1996 Reauthorization Act sought to overcome

> an environment lacking flexible recruiting, flexible salary setting, and performance-based rewards. A more flexible and innovative personnel program or structure will provide incentives for increased productivity, compensate employees based on performance, facilitate moving employees based on changes in the demand for ATC services, and improve overall management of the FAA's workforce.

S. Rep. No. 104-333, at 9 (1996). The legislative histories of the 1996 Appropriations Act and the 1996 Reauthorization Act do not specifically address whether the FAA would be permitted to retain the power to use credit hours under its new flexible personnel system. Nevertheless, Congress determined that the FAA needed "greater flexibility" in its personnel system than it had at the time, and the 1982 Flexible Schedules Act had already authorized the FAA to use credit hours. The use of the adjective "greater" to modify "flexibility" in Section 40122(g)(1) indicates that Congress was seeking to reduce, rather than increase, the constraints placed upon the FAA by current federal personnel laws. To construe Section 40122(g)(1) to limit an already existing flexibility would impermissibly convert the adjective "greater" to "lesser."

### C. *Brodowy and* Gonzalez

In response to the Congressional directive established via Section 347 of the 1996 Appropriations Act, the FAA issued its personnel management system in March of 1996. *See*

Def.'s App. 394 (FAA Personnel Management System (Mar. 28, 1996)); Def.'s PFUF ¶ 55.  In an introductory section on applicable statutes, the personnel management system states that "[a]lthough Section 347(b) exempts the new personnel system from substantially all of Title 5, FAA has the discretion to adopt the substance of any portion of Title 5 as deemed appropriate." Def.'s App. 394 (FAA Personnel Management System).

In *Brodowy v. United States*, 482 F.3d 1370 (Fed. Cir. 2007), the Federal Circuit addressed the ability of the FAA to incorporate provisions of Title 5 into its personnel management system.  In *Brodowy*, the FAA had temporarily adopted the General Schedule ("GS") pay scale set forth in Title 5 as part of its personnel management system.  482 F.3d at 1375.  Notably, the court in *Brodowy* did not find that the FAA was barred from adopting the GS pay schedule simply because it was part of Title 5, which had been waived in Section 40122(g)(2); rather, it found that the FAA was acting within its authority when it adopted the GS pay system:

> An unusual quirk in this case is that . . . the plaintiffs were not technically being paid pursuant to the GS schedule set forth in title 5 of the U.S. Code, but instead were being paid pursuant to the FAA's Personnel Management System, the administrative order that adopted the GS pay system for the interim period . . . .  The statute that authorized the Administrator to implement a compensation scheme for the agency in 1996 also provided that the portions of title 5 containing the GS system would no longer apply to FAA employees. *See* 49 U.S.C. § 40122.  After April 1, 1996, FAA employees such as the plaintiffs were therefore being paid in accordance with the GS compensation system, but because of administrative order, not because of statutory direction.

*Id*.  The court of appeals then held that the FAA's personnel management system was a "binding, money-mandating regulation" because "[i]t was specifically authorized by statute and is not in conflict with the GS system compensation provisions or any other law."  *Id*. at 1375-76.  The court in *Abbey* distinguished *Brodowy* because "the focus of the *Brodowy* court did not involve a claim under the FLSA[, whereas] here, plaintiffs specifically argue that defendant's practices are in conflict with an 'other law,' the FLSA."  82 Fed. Cl. at 739.  However, *Brodowy* accepts as a matter of law that the waiver of Title 5 in Section 40122(g)(2) does not prevent the FAA from incorporating portions of Title 5 in its personnel management system, at its discretion.

This principle ground of the decision in *Brodowy* was at the heart of the Federal Circuit's recent decision in *Gonzalez v. Department of Transp.*, 551 F.3d 1372 (2009).[18]  The plaintiff in *Gonzalez* was a former ATCS who sought back pay under the Back Pay Act, 5 U.S.C. § 5596. 551 F.3d at 1373-74.  While he was awarded back pay by the Merit Systems Protection Board, the court of appeals held that the FAA properly refused to comply with the award.  *Id*. at 1375. The court reasoned:

---

[18]The court in *Abbey* could not have taken the *Gonzalez* decision into account because it was issued by the Federal Circuit after the *Abbey* ruling was rendered.

> The language of § 40122 states:  '[t]he provisions of Title 5 shall not apply to the new personnel management system developed and implemented' by the FAA.  49 U.S.C. § 40122(g)(2).  The Back Pay Act falls in Title 5 and may only operate in favor of FAA employees if § 40122 grants an exception.  While § 40122(g)(2) lists eight exceptions to the FAA's exemption from Title 5, none of these exemptions includes the Back Pay Act, under which Gonzalez seeks relief. This omission is of no small consequence.

*Id*.  *Gonzalez* thus emphasizes two principles that relate to this case.  First, FAA employees cannot seek to enlarge the list of Title 5 protections retained in Section 40122(g)(2).  This is consistent with the emphasis in the language of Section 40122(g)(1) and its legislative history on granting the FAA "greater flexibility" in developing the personnel management system.  The plaintiff in *Gonzalez* could not seek to constrain that flexibility by importing additional Title 5 provisions into the personnel management system.  Second, the court stated that the FAA was exempted, or freed from, Title 5, which is much different than stating that the FAA was prohibited from borrowing or using parts of Title 5 in its discretion.  By specifying that the FAA was being freed from the application of Title 5, it can be implied that the FAA could adopt portions of Title 5 in its personnel management system if it so chooses.  Together, these two operative principles indicate that Section 40122(g) preserves a baseline of specific employee protections set out in Title 5 but otherwise gives the FAA extensive flexibility in choosing what, if anything, to incorporate from Title 5 in its personnel management system.

## D.  Chevron *Deference*

The government argues that if Congress was not explicit in Sections 106(*l*)(1) and 40122(g) regarding the ability of the FAA to use credit hours, the FAA's interpretation of those statutes was reasonable and entitled to deference under the doctrine articulated in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  Def's Cross-Mot. at 33.  Plaintiffs respond by asserting that "Congress has spoken to the precise question at issue – Congress mandated that 'title 5 shall not apply' to [p]laintiffs" and arguing that there is no occasion to apply *Chevron* deference to the FAA's interpretation embodied in its personnel management system.  Pls.' Reply at 7-8.  *Chevron* directs the court to consider two questions: First, whether Congress has "directly spoken to the precise question at issue;" and second, if Congress has not directly addressed the issue, "whether the agency's [determination] is based on a permissible construction of the statute."  467 U.S. at 842-43.

From the preceding discussion concerning the statutory text and applicable precedents applying that text, although Congress did not directly address the precise question of whether the FAA could or should adopt the portions of Title 5 dealing with the use of credit hours in the personnel management system, it nonetheless effectively provided the FAA with the authority to do so.  Hence, the first prong of *Chevron* applies, but, contrary to plaintiffs' position here, dictates that the court must uphold and give effect to the FAA's adoption of a credit-hour arrangement as part of its personnel management system.  *See Fathauer v. United States*, 566 F.3d 1352, 1356-57 (Fed. Cir. 2009) ("The Supreme Court has 'stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says

19

there. When the words of a statute are unambiguous, this first canon [of *Chevron*] is also the last: judicial inquiry is complete.'" (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461-62 (2002))). Among other things, as observed earlier, plaintiffs' assertion that Section 40122(g)(2) forbids the FAA from adopting the provisions of Title 5 relating to credit-hour compensation facially conflicts with the "notwithstanding" clause in Section 40122(g)(1) and also with the "greater flexibility" given to the FAA in Sections 106(*l*)(1) and 40122(g)(1). However, even if one assumes that no direct answer to the question has been supplied by the statutory language, the second prong of *Chevron* becomes relevant and leads to the same result.

Both Sections 106(*l*)(1) and 40122(g)(1) operate hand-in-hand to emphasize the freedom and flexibility afforded the FAA in its compensation determinations. The legislative histories of the statutes identify flexibility as a primary concern in the development of the personnel management system. In that respect, this case is similar to *Chevron*, where "the legislative history as a whole [was] silent on the precise issue" before the court, but "that history plainly identifie[d] the policy concerns that motivated the enactment" of the relevant program. 467 U.S. at 862-63. Here, the legislative histories manifestly convey Congress' intent to allow the FAA to exercise "greater flexibility" than it currently had in developing the personnel management system. In such a situation, *Chevron* directs this court to inquire "whether the [FAA]'s [determination] is based on a permissible construction of the statute." 467 U.S. at 843. The court concludes that at the very least the FAA's construction of Sections 106(*l*)(1) and 40122(g) as permitting it to adopt the credit-hour provisions of Title 5 is permissible. In these circumstances, the court must "not disturb [the FAA's determination] unless it appears from the statute[s] or [their] legislative history that the accommodation is not one that Congress would have sanctioned." *Id.* at 845 (quoting *United States v. Shimer*, 367 U.S. 374, 382-83 (1961)). Accordingly, the court holds that the FAA had authority to adopt the portion of Title 5 that enabled the use of credit hours to compensate those employees who worked on a flexible schedule.[19]

This holding dispenses with plaintiffs' claim that credit hours are overtime hours under the FLSA. Use of the credit-hour program had to be initiated by an employee, Pls.' App. 430 (Stip. for Credit Hours), meaning that the employee could elect to use credit hours under the personnel management system with the FAA's approval. Plaintiffs voluntarily opted to avail themselves of the credit-hour arrangement. Because this court has determined that the FAA had the authority pursuant to Sections 106(*l*)(1) and 40122(g) to adopt portions of Title 5 dealing

---

[19]Plaintiffs assert that the fact that the new collective bargaining agreement does not include a provision granting one-to-one credit hours is "highly probative of [d]efendant's recognition that its policy and practice of granting one-to-one credit hours violated the FLSA." Pls.' Mot. at 13. The absence of the credit-hour program in the latest collective bargaining agreement has no bearing on the permissibility of the inclusion of a credit-hour arrangement in the FAA's personnel management system. The collective bargaining agreement relates to air traffic controllers and not to the totality of the FAA's employees, and the court has no facts before it that bear on the negotiations that led up to the most recent agreement or those that preceded it (which prior agreements included a credit-hour provision).

with flexible work schedules and credit-hour compensation, the FAA could properly include in its personnel management system the specification that credit hours are "non-overtime hours worked under a F[lexible] W[ork] S[chedule] which are in excess of an employee's basic work requirement and which are worked at the election of the employee after approval by the Agency." Def.'s App. 338, § 7 (2006 Collective Bargaining Agreement); *cf.* 5 U.S.C. § 6121(6) ("'[O]vertime hours', when used with respect to flexible schedule programs under sections 6122 through 6126 of this title, means all hours in excess of 8 hours in a day or 40 hours in a week which are officially ordered in advance, but does not include credit hours."); *Doe v. United States*, 513 F.3d 1348, 1358 (Fed. Cir. 2008) ("[C]redit hours, by statutory definition, are not overtime hours.") (citing 5 U.S.C. § 6121(6)). Therefore, the credit hours plaintiffs worked are not FLSA overtime hours, and plaintiffs are not entitled to overtime compensation for those hours. There being no material issue of disputed fact, the government is entitled to summary judgment on the credit-hour claim.

## II. SECURITY INSPECTIONS

As their second claim, plaintiffs contend the FAA violated the FLSA when it failed to provide them with overtime compensation for time spent on activities related to security procedures at Edwards AFB. *See* Pls.' Mot. at 13-14. The government responds that plaintiffs' claim amounts to a demand for compensation for commuting activities, which demand is barred by the Portal-to-Portal Act. Def.'s Cross-Mot. at 4.

Plaintiffs, relying on a prior decision of this court, argue that the court should apply a three-factor test to determine whether an activity is "an integral and indispensable part of the employees' principal activity" by determining whether each task "(1) was undertaken for the benefit of the employer; (2) was known or reasonably should have been known by the employer to have been performed; and (3) was controlled or required by the employer." Pls.' Mot. at 14 (quoting *Bull v. United States*, 68 Fed. Cl. 212, 222 (2005), *clarified*, 68 Fed. Cl. 276, *aff'd*, 479 F.3d 1365 (Fed. Cir. 2007)).[20] Plaintiffs contend that the pre- and post-shift security activities for which they seek compensation were undertaken for the government's benefit because they were necessary to enable plaintiffs to go to and from work and benefitted the government by helping to ensure the base's security. *Id.* at 15-16 (quoting *Bull*, 68 Fed. Cl. at 233 ("To benefit the employer, an activity need not be 'productive' – rather, it must be necessary to the employee's ability to accomplish the principal duties owed to the employer.)). They further argue that these activities were controlled and required by the government, *id.* at 17, and that the government knew of these required activities. *Id.* at 18.

---

[20]The three-factor test advocated by plaintiffs has also been adopted by the Eleventh Circuit. *See Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1344 (11th Cir. 2007); *see also Anderson v. Perdue Farms, Inc.*, 604 F. Supp. 2d 1339, 1351 (M.D. Ala. 2009) (distinguishing the Eleventh Circuit's three-factor test from the test articulated by the Second Circuit in *Gorman v. Consolidated Edison Corp.*, 488 F.3d 586, 592-93 (2d Cir. 2007), which "rests on separate definitions for integral and indispensable").

The government concedes that plaintiffs' security-related activities for which they seek overtime compensation were necessary for them to be able to work at TRACON,[21] but argues that that circumstance does not automatically make them "integral and indispensable" to plaintiffs' principal activities. Def.'s Cross-Mot. at 10-11 (quoting *IBP*, 546 U.S. at 40-41 ("The fact that certain preshift activities are necessary for employees to engage in their principal activities does not mean that those preshift activities are 'integral and indispensable' to a 'principal activity' . . . . [W]alking from a time clock near the factory gate to a workstation is certainly necessary for employees to begin their work, but it is indisputable that the Portal-to-Portal Act evinces Congress' intent to repudiate *Anderson [v. Mt. Clemens Pottery Co.]*'s holding that such walking time was compensable under the FLSA.")); *see also Gorman*, 488 F.3d at 593 (holding that while a necessary activity may be "indispensable," under the *Steiner* test it must also be "integral" to the performance of the employees' principal activities to merit compensation). Rather, the government asserts that for preliminary and postliminary activities to be compensable, the activities must be closely related to and an integral part of plaintiffs' principal activities, namely, to separate and direct live air traffic. Def.'s Cross-Mot. at 8-9. According to the government, "[t]he commuting activities for which plaintiffs[] seek reimbursement bear no relation whatsoever to these principal activities." *Id.* at 11. Rather, everyone who comes onto Edwards AFB is subject to similar security procedures, regardless of what their business is on the base. *Id.* at 12; Def.'s PFUF ¶¶ 30-31; Def.'s App. 276-77, ¶¶ 3-4 (Dina Decl.) ("The security procedures at the gate [and elsewhere on base] are the same regardless of whether the person entering lives on the base, works at a restaurant in the food court, or works on classified military operations."). "Accordingly, there is nothing about plaintiffs' principal activities that makes undergoing Edwards AFB's security procedures an 'integral and indispensable part of' their air traffic control duties." Def.'s Cross-Mot. at 12.

While plaintiffs claim they are not required to prove a "close relationship" between the alleged compensatory activity and the principal activities of their employment, *see* Pls.' Reply at 12, they nonetheless assert that such a close relationship exists in this case. *Id.* According to plaintiffs, the various activities associated with security "are closely related to [p]laintiffs'

--------------------------------------------

[21]Nonetheless, the government disputes that plaintiffs' activities for which they seek overtime compensation are for the benefit of their employer. Def.'s Cross-Mot. at 14 n.8. The government asserts that plaintiffs' employer is the FAA, and not the United States generally. *Id.* (citing 5 C.F.R. § 551.104 ("Hours of work means all time spent by an employee performing an activity for the benefit of an agency and under the control and direction of the agency.")). As the government would have it, plaintiffs consequently were not under the FAA's direction and control until they signed into work at TRACON. *Id.* Further, the government disputes the extent of the restrictions placed on plaintiffs, who were free to use various amenities on the base prior to and after their shifts. *Id.*

The court is dubious about the distinction the government would draw between the FAA and the government generally, but the court need not reach a decision whether the FAA might be distinguished from the federal government generally as plaintiffs' employer for purposes of the FLSA because other grounds are dispositive of plaintiffs' security-inspection claim. *See* the discussion *infra*.

principal activity of separating and directing live air traffic at TRACON because [d]efendant chose to have TRACON located on Edwards AFB, and . . . the security is necessary to ensure the safety of the skies. . . .  Separating and directing live air traffic requires a higher degree of safety at the air traffic control tower – where the principal activity is performed – and in the surrounding areas." *Id*. at 13.  Plaintiffs further argue that the security measures enhance the effectiveness of their jobs and the safety of the flying public. *Id*.  "Like the safety equipment a butcher puts on helps the butcher focus on his job of cutting meat rather than his own safety, these security measures permit [p]laintiffs to focus on directing and controlling air traffic and the safety of the skies rather than the safety of the TRACON facility and the potential motives of those individual[s] that could come into an unsecure facility." *Id*.

The Federal Circuit has explained that under the "integral and indispensable" standard, "'[t]he more the preliminary (or postliminary) activity is undertaken for the employer's benefit, *the more indispensable it is to the primary goal of the employee's work*, and the less choice the employee has in the matter, the more likely such work will be found to be compensable.'"  *Bobo v. United States*, 136 F.3d 1465, 1467 (Fed. Cir. 1998) (emphasis added) (quoting *Reich v. New York City Transit Auth.*, 45 F.3d 646, 650 (2d Cir. 1995)).  An activity is indispensable to the primary goal of an employee's work if it is "*closely related* to the [employee's] principal work activities." *Id*. at 1468 (emphasis added); *see also Steiner*, 350 U.S. at 252-253 (upholding a trial court's determination that activities "made necessary by the nature of the work performed[] [which] fulfill mutual obligations between [employers] and their employees . . . [and] are *so closely related to other duties performed by . . . employees as to be an integral part thereof* . . . are . . . included among the principal activities of said employees") (internal quotations omitted) (emphasis added).

Plaintiffs' reliance on *Bull* to argue that the three-factor test set forth in that decision excludes consideration of how closely related an activity is to an employee's principal activity, *see* Pls.' Reply at 12, is misplaced.  Notably, plaintiffs' position respecting the three-factor test set out in *Bull* is incomplete for determinations made under the FLSA as modified by the Portal-to-Portal Act.  First, the court in *Bull* used the three-factor test as the basis for determining whether an activity constitutes "work" for purposes of the FLSA.  *See Bull*, 68 Fed. Cl. at 220, 222.  But, in doing so, the court in *Bull* acknowledged the Supreme Court's determination "that *activities 'made necessary* by the nature of the work performed,' *which 'fulfill mutual obligations,'* between employers and employees *and 'are so closely related to other duties performed' are principal activities.*" *Id*. at 222 (quoting *Steiner*, 350 U.S. at 252) (emphasis added).  *Steiner* had emphasized the importance of the portal-to-portal provisions in administering the FLSA, *see Steiner*, 350 U.S. at 248, and *Bull* accordingly took that emphasis into account.

Similarly, the Federal Circuit's decision in *Bobo* also recognizes that a court must consider the degree to which "the preliminary (or postliminary) activity is . . . indispensable . . . to the primary goal of the employee's work," 136 F.3d at 1467, a factor that is satisfied by a close relationship between the activity at issue and the employee's principal work activities.  *Id*. at 1468.  Indeed, in *Bonilla*, the leading decision in the Eleventh Circuit adopting the three-factor

23

test, the court of appeals indicated that a close relationship between preliminary and principal activities was necessary by, among other things, holding that time spent passing through security was not compensable under the FLSA because the screening was not integral and indispensable to a principal activity. *Bonilla*, 487 F.3d at 1344-45. This interpretation is bolstered by a general statement from the Department of Labor interpreting the Portal-to-Portal Act of 1947, stating that "[a]mong the activities included as an integral part of a principal activity are those closely related activities which are indispensable to its performance . . . . [Activities] not directly related to [an employee's] principal activities . . . such as checking in and out and waiting in line to do so[,] would not ordinarily be regarded as integral parts of the principal activity or activities." 29 C.F.R. § 790.8(c); *see also Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("[R]ulings, interpretations and opinions of the [implementing agency] . . ., while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.").

The security activities for which plaintiffs seek compensation, although necessary for them to travel to TRACON, are not integral and indispensable to their principal activities as air traffic controllers, despite plaintiffs' best attempts to argue otherwise. Plaintiffs speculate, without factual support, that the security procedures in place at Edwards AFB are intended to ensure that TRACON is "free from any potential threats that may interrupt air traffic," and are "necessary to ensure the safety of the skies." Pls.' Reply at 13. But the security inspections, vehicle inspections, and gate closures apply to everyone who enters and exits Edwards AFB, whether to work at TRACON or elsewhere, or merely to visit persons who live on base. In effect, the security inspections are an extension of plaintiffs' commute and, absent some relation to plaintiffs' principal activities, are not compensable under the Portal-to-Portal Act.[22]

A recent decision from the Second Circuit is instructive. *See Gorman*, 488 F.3d 586. In *Gorman*, employees at a nuclear power plant sought compensation under the FLSA for time spent passing through multiple layers of security and then donning protective clothing, a process taking between ten and thirty minutes a day. *Id*. at 591.[23] The court held that while the entrance and exit activities were "necessary in the sense that they [were] required and serve[d] essential

---

[22]This was the conclusion also reached by the Eleventh Circuit in *Bonilla*. 487 F.3d at 1344 ("[A]lthough the [security] screening was necessary for the employees to perform their work, appellee did not primarily – or even particularly – benefit from the security regime.").

[23]The specific activities for which they sought pay included "[w]aiting in traffic outside the plant entrance," "[b]adge inspection at the entrance, including a visual check of the interior of the car, and occasional random vehicle inspection," "[p]arking and walking to the command post," "[w]aiting in line to swipe an ID badge and to palm a sensor," "[w]alking to the job-site," "[a]nd at the end of the shift, doing many of these things in reverse." *Gorman*, 488 F.3d at 592.

24

purposes of security[,] . . . they [were] not integral to principal work activities." *Id*. at 593.   The court further commented that

> These security-related activities are modern paradigms of the preliminary and postliminary activities described in the Portal-to-Portal Act, in particular, travel time. The plain wording of subsection (1) of the Portal-to-Portal Act exempts from the FLSA: "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform."

*Id*. (quoting 29 U.S.C. § 254(a)(1)).   This is not to exclude the possibility that security procedures may be integral to the duties of other types of employees – *e.g.*, those responsible for the security procedures themselves – but that exceptional possibility is not reflective of the facts of this case.[24]   Additionally, in its ruling in *Gorman*, the Second Circuit dismissed the plaintiffs' contention that the rigorousness and time-consuming nature of the security activities made them principal activities. *Id*. at 594.   In addressing that contention, the court observed that the security measures were required of all employees regardless of their work, as well as all visitors, and therefore could not be integral to these particular plaintiffs' principal activities. *Id*.[25]

Compatibly with *Gorman*, other courts have also held that employees are not entitled to FLSA overtime for time spent undergoing security checks and waiting to traverse security checkpoints. *See Sleiman v. DHL Express*, No. 09-0414, 2009 WL 1152187, at **3-5 (E.D. Pa. Apr. 27, 2009) (Slomsky, J.) (holding that time spent waiting in line to go through security screening and time spent in security screening were not compensable under FLSA); *Anderson v. Perdue Farms*, 604 F. Supp. 2d at 1359 (same); *Hodge v. Lear Siegler Serv., Inc.*, No. CV 06-263-MHW, 2008 WL 2397674, at **9-11 (D. Idaho June 9, 2008) (same); *cf. United States Dep't of Air Force v. Federal Labor Relations Auth.*, 952 F.2d 446, 452-53 (D.C. Cir. 1991) (holding that time Air Force employees spent waiting to leave work due to gate obstruction could not be the subject of collective bargaining because it was not compensable pursuant to 5 C.F.R. § 551.412(b)(2)).   These decisions are persuasive and dispositive of plaintiffs' security-inspection claims.   The security inspections plaintiffs must undergo to enter and leave Edwards AFB are not integral to their principal activities as air traffic controllers.

---

[24]*See Gorman*, 488 F.3d at 593 n.5 (quoting 29 C.F.R. § 790.7(c) ("Rules may yield to particular instances.   For example, passing through preliminary security procedures may be integral to the principal activity of an employee responsible for monitoring, testing and reporting on the plant's infrastructure security.")).

[25]Plaintiffs endeavor to distinguish *Gorman* by asserting that the case involved a private employer and did not concern the safety of the flying public. Pls.' Reply at 13-14.   However, these distinctions are immaterial and irrelevant, particularly given that *Gorman* involved a nuclear power plant, where considerations for public safety are of vital importance.

Likewise, plaintiffs are not entitled to compensation for time spent waiting in line at the gates to Edwards AFB. The Supreme Court in *IBP* held that poultry plant employees who had to don specialized protective gear, a compensable activity under the FLSA not exempted by the Portal-to-Portal Act, were not entitled to compensation for time spent waiting to don such gear. 546 U.S. at 40-41. The Supreme Court described this waiting time to don protective gear as a "preliminary" activity that, while necessary for certain employees, was nonetheless "two steps removed from the productive activity on the assembly line" and not "integral and indispensable" to a "principal activity." *Id.* at 41-42 (citing 29 C.F.R. § 790.7(g) (characterizing the time that employees must spend waiting to check in or waiting to receive their paychecks as generally a "preliminary" activity covered by the Portal-to-Portal Act)). The same analysis applies to the waiting time in this case.

In sum, plaintiffs' continuous workday begins when they arrive at TRACON and ends when they leave TRACON, and therefore any time driving, waiting, and undergoing inspections occurring outside that time is properly excluded by the Portal-to-Portal Act.[26] The government is entitled to summary judgment on plaintiffs' security-inspection claims.

### III. MEDICAL CLEARANCES

As a third claim, plaintiffs contend that, pursuant to the FLSA and the applicable collective bargaining agreements, they should have been compensated for time spent in obtaining medical clearances. Pls.' Mot. at 23-25. While plaintiffs were compensated for time spent in annual or bi-annual physical examinations at the Los Angeles Center, as well as time spent driving between TRACON and the Center, they were not compensated for time spent driving between their homes and the Center. *See supra* at 7-8. Plaintiffs were also not compensated for time spent obtaining medical examinations to support requests for waivers of medical standards, a circumstance that would arise once an ATCS failed an aspect of a medical examination required by the FAA. *Id.* Plaintiffs seek compensation for time spent driving between the Los Angeles Center and their homes, for time spent driving to and from waiver-related examinations, and reimbursement for medical expenses and travel mileage associated with the waiver examinations. Pls.' Mot. at 25. The government contests plaintiffs' claim for compensation of waiver examination expenses on the ground that the FAA did not require waiver requests and thus that medical examinations aimed at supporting waiver requests were undertaken solely at the behest of ATCSs who had failed a medical examination for some reason. Def.'s Cross-Mot. at 23-25. The government contends that because waiver-related examinations were not required by

---

[26]Given this conclusion, the court finds it unnecessary to address the government's secondary defense that the various security-related activities for which plaintiffs seek compensation were *de minimis* and therefore should be disregarded. *See* Def.'s Cross Mot. at 18 (citing *Bobo*, 136 F.3d at 1467 ("[W]here the compensable preliminary work is truly minimal, it is the policy of the law to disregard it.")).

the FAA, time spent on those examinations was not compensable within the meaning of the FLSA. *Id.* at 23.[27]

### A. Claims Based Upon Collective Bargaining Agreements

For their medical-clearance claims, plaintiffs rely principally on the applicable collective bargaining agreements,[28] arguing that the court should enforce the terms of those agreements and require defendant to "compensate [p]laintiffs for time spent obtaining all medical examinations and reimburse [p]laintiffs for all such medical expenses and for travel mileage to and from all medical examinations." Pls.' Mot. at 25.  Notably, however, plaintiffs' complaint does not set out a claim premised upon the collective bargaining agreements, focusing instead on alleged violations of the FLSA to support a claim for compensation for time related to medical-waiver examinations. *See* Second Amended Compl. ¶ 9.  The government resists the new claim by contending that plaintiffs, having failed initially to plead a claim under the collective bargaining agreements or to amend their complaint to plead such a claim, should be barred from raising that claim for the first time in their motion for partial summary judgment.  Def.'s Cross-Mot. at 26 (citing *Crest A Apts., Ltd. II v. United States*, 52 Fed. Cl. 607, 613 (2002) (refusing to consider claim asserted in summary judgment motion but not in complaint because plaintiff failed to amend complaint and new issues raised could prejudice defendant)).

Plaintiffs respond that the collective bargaining agreements serve as "alternate grounds" for liability, and not a "separate and distinct breach of collective bargaining agreement claim for damages." Pls.' Reply at 22.  Further, plaintiffs argue that, even if they should have alleged the claim separately in their complaint, they have sufficiently pled their medical claims under the notice pleading standard, and the government is not prejudiced because it became fully aware of those claims earlier and had ample notice and time to conduct discovery on those issues. *Id.* at 23 (distinguishing *Crest A Apts.*, 52 Fed. Cl. at 608 (failure to include breach of contract claim prejudiced defendant by limiting discovery solely to other claims presented in the complaint)). Finally, plaintiffs seek leave to amend their complaint if necessary, which leave "[t]he court should freely give . . . when justice so requires." *Id.* at 24 (quoting Rule 15(a) of the Rules of the Court of Federal Claims).

---

[27]The government does not directly address plaintiffs' claim for compensation for time spent traveling between the Los Angeles Center and their homes. *See* Def.'s Cross-Mot. at 23-26.  However, its arguments regarding the security procedures at Edwards AFB, discussed earlier, bear on this aspect of plaintiffs' medical-clearance claim.

[28]The collective bargaining agreements each state that "[a]ll medical examinations required by the [FAA] shall be scheduled on duty time.  Employees shall be reimbursed for mileage and parking fees."  Def.'s App. 325 (2003 Collective Bargaining Agreement); Def.'s App. 339 (2006 Collective Bargaining Agreement); Def.'s App. 355 (2009 Collective Bargaining Agreement), *see also* Pls.' PFUF ¶¶ 65-66 (citing Pls.' App. 333, Art. 66, § 4 (Collective Bargaining Agreement)).

Plaintiffs' reliance on the collective bargaining agreements as a basis for their claim for compensation for time spent on medical examinations has a materially different predicate than their separate claim under FLSA for failure to compensate plaintiffs for medical-waiver examinations and related expenses.  Nonetheless, facts pertinent to plaintiffs' claim based on the collective bargaining agreements substantially overlap those pertinent to the FLSA claim for these same expenses.[29]  Moreover, the government has not averred that it would be prejudiced if plaintiffs were permitted to amend their complaint.  Accordingly, the court grants plaintiffs' request for leave to amend their complaint, deems their Second Amended Complaint to be amended to set out their claim under the collective bargaining agreements, and treats that claim as if it had been properly raised in the Second Amended Complaint.

Assuming plaintiffs' claim arising under the collective bargaining agreements is properly before the court, the government argues that that claim is barred by an exclusive dispute resolution clause in the bargaining agreements.  Def.'s Cross-Mot. at 26.  The pertinent clause provides for a grievance procedure that is "the exclusive procedure available to the Parties and the employees in the unit for "resolving grievances," with limited exceptions not relevant here.  Def.'s App. 312, Art. 9, § 2 (2003 Collective Bargaining Agreement), 332, (Art. 9, § 2 (2006 Collective Bargaining Agreement), 344, (Art. 9, § 2 (2009 Collective Bargaining Agreement).  The collective bargaining agreement in force from October 1, 2004 through September 2, 2006 defines a "grievance" as: (1) "any complaint . . . by any employee concerning any matter relating to the employment of the employee"; or (2) "any complaint . . . by a unit employee or either Party concerning any claimed violation, misinterpretation, or misapplication of any law, rule or regulation affecting conditions of employment as provided in the Civil Service Reform Act of 1978 or this agreement."  Def.'s App. 311, Art. 9, § 1 (2003 Collective Bargaining Agreement).  The collective bargaining agreements in force from September 3, 2006 to the present define a "grievance" as (1) "any complaint . . . [B]y any employee concerning any matter relating to the employment of the employee"; or (2) "any complaint . . . [b]y a unit employee or either Party concerning any claimed violation, misinterpretation, or misapplication of any law, rule, regulation, or this Agreement affecting conditions of employment."  Def.'s App. 332, Art. 9, § 1 (2006 Collective Bargaining Agreement); Def.'s App. 344, Art. 9, § 1 (2009 Collective Bargaining Agreement).

Plaintiffs' claim alleging a breach of the collective bargaining agreements is a "complaint . . . by [an] employee concerning [a] matter relating to the employment of the employee," and a "complaint . . . by a unit employee . . . concerning [a] claimed violation . . . of . . . th[e] Agreement affecting conditions of employment."  Def.'s App. 311, 332, 344 (Art. 9, § 1, of 2003, 2006, and 2009 Collective Bargaining Agreements).  Therefore, the grievance procedure contained in the agreements is "the exclusive procedure available to the Parties" for redress, *id.*, and the claim consequently may not be heard by this court.  *See Todd v. United States*, 386 F.3d

---

[29]Plaintiffs' claims for compensation for time spent on medical-waiver examinations and traveling to and from their physicians conducting such examinations are made pursuant to both the collective bargaining agreements and the FLSA.  However, plaintiffs' claim for mileage reimbursement arises only pursuant to the collective bargaining agreements and not the FLSA.

1091, 1094 (Fed. Cir. 2004) (finding that the exclusive grievance procedure in the FAA's 1998 collective bargaining agreement with the National Air Traffic Controllers Association, AFL-CIO barred a suit based upon the agreement).[30]  As the Federal Circuit opined in *Todd*, "[t]he [collective bargaining agreement] includes its own enforcement provisions. . . .  [Plaintiffs], in essence, seek to gain the benefit of the [collective bargaining agreement], and at the same time, to circumvent the exclusive grievance procedures of the contract."  *Id*. at 1094; *see also Doe v. United States*, 513 F.3d at 1355 ("[A]ny rights granted to SSA employees by the Agreement that are subject to the grievance procedure are not rights that an employee can enforce by suit in the Court of Federal Claims.") (citing *Todd*).

To circumvent the exclusive effect of the grievance procedure, plaintiffs argue that another provision of the collective bargaining agreements, when interpreted with the grievance procedure as a whole, indicates that the grievance procedure is not "exclusive," and therefore that they should be permitted to bring their claim under the collective bargaining agreements before this court.  Pls.' Reply at 25.  The other provision cited by plaintiffs exists within an article entitled "Problem Solving" that sets forth a number of procedural means to address complaints, problems, and concerns that might arise, and states:

> The parties recognize that the traditional methods of dispute resolution (e.g., grievance/arbitration and unfair labor practice charges) are reactive and not always the most efficient means of problem resolution.  The Parties also understand that an early and open exchange of information is essential to clearly address the concerns or reservations of each Party.  Therefore, the Parties agree to use the provisions of this  [Problem Solving] Article to the fullest extent possible *before resorting to other avenues of dispute resolution*.

Pls.' Reply App. 067, Art. 8, § 1, (2006 Collective Bargaining Agreement) (emphasis added). Plaintiffs implicitly argue that this provision's reference to "other avenues of dispute resolution" signifies that the grievance procedure in Article 9 of the collective bargaining agreement cannot be the exclusive means available to them to seek redress, or else the phrase "other avenues of dispute resolution" would be rendered meaningless.  Pls.' Reply at 24-25 (citing *Keeter Trading Co., Inc. v. United States*, 79 Fed. Cl. 243, 257 (2007) ("[C]ourt[s] will avoid an interpretation that renders a portion of the contract useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.") (internal quotation omitted)).

However, the phrase "other avenues of dispute resolution" is not rendered meaningless by an exclusive dispute resolution procedure because Article 9 specifically enumerates situations in

---

[30]The "exclusive procedure" language and definition of "grievance" is the same in both the 1998 collective bargaining agreement before the Federal Circuit in *Todd* and the 2003 collective bargaining agreement applicable to this case.  *See* Def.'s App. 303 (Agreement between the National Air Traffic Controllers Association, AFL-CIO and the FAA (Sept. 1998)), 311-12 (2003 Collective Bargaining Agreement).

which the formal grievance procedure does not apply, although none of those exceptions apply to this case.  *See* Def.'s App. 332, Art. 9, § 3 (2006 Collective Bargaining Agreement); *see also Todd*, 386 F.3d at 1093 (barring suit based on 1998 collective bargaining agreement because of exclusive dispute resolution clause, which agreement contains the same "other avenues of dispute resolution" language); Def.'s Reply App. at 5 (1998 Collective Bargaining Agreement). Further, to hold that a reference to "other avenues of dispute resolution" means that plaintiffs can bring a claim under the agreements in this court would render meaningless the language in Article 9 stating that the grievance procedure was "the exclusive procedure available," subject to certain exceptions none of which apply here.  Def.'s App. 312, 332, 344 (Art. 9, § 2, of the 2003, 2006, and 2009 Collective Bargaining Agreements).  In sum, even as deemed to be before the court via an amendment to plaintiffs' Second Amended Complaint, plaintiffs' claim based on alleged violations of the collective bargaining agreements is barred by the exclusive dispute resolution clause contained in those agreements.

### B. FLSA Claims

#### 1. Travel time.

Plaintiffs were compensated for time spent at required medical examinations, as well as for travel time between the Los Angeles Center and TRACON.  *See* Def.'s PFUF ¶ 33; Pls.' PFUF ¶ 69; Def.'s App. 103-104, 55:15 to 56:12 (Sperling Dep.).  Now, plaintiffs also seek to recover compensation for time spent traveling between their homes and the Los Angeles Center for mandatory annual or bi-annual physical examinations.  Pls.' Mot. at 2, 24-25.  Essentially, on days when FAA-mandated medical examinations were scheduled, under the FAA's policies, plaintiffs' work day either began or ended at the Los Angeles Center, and travel from home to the Center or from the Center back home was treated by the FAA as commuting time that was not compensable under the Portal-to-Portal Act.  Plaintiffs argue that all travel time spent driving to and from the Los Angeles Center is an integral and indispensable part of their principal duties. Pls.' Mot. at 25.

The government's compensation practice must be tested against its obligations under the FLSA and the Portal-to-Portal Act.  Respecting those Acts, in *IBP*, the Supreme Court held that an employer had to compensate poultry workers for time spent donning and doffing protective gear deemed integral and indispensable to their principal activities, as well as "postdonning and predoffing walking time" when the workers walked between the locker rooms and production floor before and after their assigned shifts.  546 U.S. at 30-34.  However, time spent walking to the locker room prior to work or from the locker room after work was not compensable.  *Id.* Based upon this analog, plaintiffs' principal activity on the days scheduled for required medical examinations was the medical examination itself because that examination was integral and indispensable to their work as ATCSs.  However, the time plaintiffs spent traveling to or from the Los Angeles Center from or to their homes was not integral but rather amounted to commuting time.  *See* Portal-to-Portal Act, § 4, 61 Stat. at 86-87 (codified at 29 U.S.C. § 254(a) ("[N]o employer shall be subject to any liability or punishment under the [FLSA] . . . on account

30

of the failure of such employer to pay an employee . . . overtime compensation . . . for . . . traveling to and from the actual place of performance of the principal activity.")).

2. *Time spent on medical-waiver examinations.*

Some of the plaintiffs who failed to pass their medical examination sought and obtained a medical waiver under special consideration, which required them to obtain additional reports and tests from their private physicians. *E.g.*, Pls.' App. 344, ¶ 16 (Burns Decl.); Pls.' App. 353, ¶ 13 (Landon Decl.). The FAA did not compensate them for time spent obtaining a waiver. Pls.' PFUF ¶ 67; *e.g.*, Pls.' App. 267, 103:8-10 (Whalen Dep.). Plaintiffs essentially contend that they should be compensated for the additional medical visits and tests involved in obtaining waivers, just as they were for the required annual or bi-annual medical examinations, arguing that obtaining medical waivers was integral and indispensable to their principal activities in that the waivers were necessary to their ability to accomplish the principal duties owed to their employer. *See* Pls.' Mot. at 23-25. The government responds that, unlike the physical examinations conducted at the Los Angeles Center, the tests and additional reports plaintiffs obtained from their private physicians are not mandatory, are not beneficial to the FAA, are not under the control or direction of the FAA, and are not required by the FAA. Def.'s Cross-Mot. at 23. Therefore, according to the government, plaintiffs were not performing work and the FAA did not violate the FLSA by not compensating them. *Id.* at 25.

The salient question to be answered is whether the medical examinations and tests undertaken by plaintiffs to obtain waivers for special consideration qualify as compensable work under the FLSA. "Compensable work under the FLSA includes work that is 'suffer[ed] or permit[ted].'" *Bull*, 68 Fed. Cl. at 220 (quoting 29 U.S.C. § 203(g) and citing *Armour & Co. v. Wantock*, 323 U.S. 126, 132 (1944) (stating that the overtime provisions of the FLSA "apply only to those who are 'employees' and to 'employment' in excess of the specified hours" and that, as defined under the Act, the term "'employ' includes to suffer or permit to work") (quoting 29 U.S.C. § 203(g)).

"The FLSA, as interpreted by the Office of Personnel Management's regulations, requires federal agencies to pay employees for '[a]ll time spent by an employee performing an activity for the benefit of the agency and under the control and direction of the agency.'" *Bobo*, 136 F.3d at 1467 (quoting 5 C.F.R. § 551.401(a)); *see also Tennessee Coal, Iron & R. Co.*, 321 U.S. at 598 (An activity constitutes "work," compensable under the FLSA, if it involves "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business.").

The parties disagree as to whether the activities that plaintiffs undertook to obtain medical waivers were for the primary benefit of the FAA. Plaintiffs argue that because some plaintiffs needed these additional visits to qualify for continued employment as ATCSs, these visits were for the benefit of the FAA. Pls.' Reply at 22. The government counters that because the waiver process is optional and allows an employee to maintain his or her employment despite failing to meet the medical standards, it benefits the employee, not the FAA. Def.'s Cross-Mot.

31

at 24; Def.'s Reply at 10-11.  As a general matter, both an employee and an employer benefit when an employee is able to continue working.  The activities of plaintiffs – seeking and obtaining medial waivers – are necessary in the sense that plaintiffs would be unable to continue working at TRACON without them.  Also, the activities entailed in obtaining additional medical examinations to support a medical waiver are not for the "personal convenience" of the plaintiffs but rather relate to their medical qualifications for employment.  *Mt. Clemens Pottery*, 328 U.S. at 693.  Further, the test is not whether the employer is the "sole beneficiary" of the activity, but rather whether the employer derives a significant benefit from the activity.  *See Trecee v. City of Little Rock*, 923 F. Supp. 1122, 1127 (E.D. Ark. 1996) (citing *Henson v. Pulaski County Sheriff Dep't*, 6 F.3d 531 (8th Cir. 1993)); *see also Graham v. City of Chicago*, 828 F. Supp. 576, 581 (N.D. Ill. 1993) ("'The activity is employment under the Act if it is done at least in part for the benefit of the employer, even though it may also be beneficial to the employee.'") (quoting *Secretary of Labor v. E.R. Field, Inc.*, 495 F.2d 749, 751 (1st Cir. 1974)).  Finally, "an activity need not be 'productive'" to benefit an employer; "rather, it must be necessary to the accomplishment of the employee's principal duties to the employer."  *Bull*, 68 Fed. Cl. at 223 (citing *Tennessee Coal, Iron & R. Co.*, 321 U.S. at 599).  The FAA plainly benefits when its employees obtain medical waivers and are able to continue as ATCSs, although plaintiffs also benefit from that continuation.  However, it is not enough that an activity benefit the employer; it must also be controlled or required by the employer for the FLSA to mandate compensation.

        The annual or bi-annual medical examinations at the Los Angeles Center are scheduled by the FAA on duty time, and controllers are not given a choice regarding the date or time of the examination.  *See* Def.'s PFUF ¶ 33; Pls.' App. 299, 12:3-12 (Griswold Dep.); Pls.' App. 184, 66:10-18 (Shinar Dep.); Def.'s App. 73-74, 82:2 to 83:4 (Whalen Dep.).  If a controller failed to meet the medical standards, he or she could seek a waiver, or special consideration, of the medical standards.  Def.'s PFUF ¶ 34; Def.'s App. 339, Art. 66, § 6b (2006 Collective Bargaining Agreement) ("If an employee does not meet the retention standards, the employee may submit further medical evaluations or reports to the Flight Surgeon in order to obtain initial or special consideration.  All transportation and expenses will be borne by the employee.").  The FAA would provide the controller with a memorandum listing the standards they failed to satisfy and describing the medical documentation the FAA anticipated it would need to assess whether the controller could obtain a waiver of the medical standards.  Def.'s PFUF ¶ 35; Def.'s App. 51, 36:2-23 (Griswold Dep.); *see also* Def.'s App. 339, Art. 66, § 6c (2006 Collective Bargaining Agreement) ("If an employee does not meet the standard, either temporarily or permanently, the medical examiner will outline for the employee, in writing, which of the medical standards have not been met.").  To obtain the documentation necessary to obtain special consideration, plaintiffs sometimes needed to undergo examinations by their own private doctors.  Def.'s PFUF ¶ 36; Def.'s App. 49, 16:5-10 (Griswold Dep.).  Those examinations were scheduled by plaintiffs on plaintiffs' own time.  Def.'s PFUF ¶ 37; Def.'s App. 78, 103:2-10 (Whalen Dep.); Def.'s App. 109, 66:12-24 (Sperling Dep.); Def.'s App. 177, 80:2-24 (Shinar Dep.); Def.'s App. 255-56, 93:5 to 94:1 (Schmidt Dep.).  The FAA did not dictate which doctors must conduct the examinations.  Def.'s PFUF ¶ 38; Def.'s App. 109, 66:21-24 (Sperling Dep.); Def.'s App. 180, 90:9-11 (Shinar Dep.).  Also, the FAA did not place any restrictions upon the conduct of the examinations by private doctors, and the plaintiffs accordingly were free to discuss any medical issues at these

examinations and receive any medical treatment regardless of whether it related to their FAA medical clearance. Def.'s PFUF ¶ 39; Def.'s App. 78-80, 103:11 to 105:24 (Whalen Dep.); Def.'s App. 180, 90:3-8 (Shinar Dep.); Def.'s App. 257-58, 96:5 to 97:2 (Schmidt Dep.).

Plaintiffs assert that the additional medical examinations were required and controlled by the government because the examinations were "undeniably necessary for [p]laintiffs' continued employment." Pls.' Reply at 21. Further, "[i]t is [d]efendant's requirement that if its ATCSs want to continue their employment, they must obtain a medical certificate, and if necessary, obtain special consideration to meet [d]efendant's medical standards to qualify for a medical certificate." *Id.* In addition, "[d]efendant controls what documentation the ATCSs need to obtain special consideration for their continued employment." *Id.*

The government has the better position in this disputed issue. All that the FAA requires is that ATCSs attend an annual or bi-annual physical, on compensated duty time, and meet certain medical requirements. Those who fail to meet the medical requirements have the option to seek a waiver by personally seeking out additional documentation. *See* Def.'s App. 339, Art. 66, § 6b (2006 Collective Bargaining Agreement) ("If an employee does not meet the retention standards, the employee *may* submit further medical evaluations or reports to the Flight Surgeon in order to obtain initial or special consideration.") (emphasis added). The FAA does not control the activities necessary to obtain that documentation. Plaintiffs choose the doctor and schedule the appointments, and plaintiffs are free to combine the examination with any other medical inquiry or treatment for their personal benefit. The FAA affects additional examinations only indirectly by setting its medical standards and providing a waiver process. Such indirect control is insufficient to make the FAA liable under the FLSA for compensation. The contrast between the two types of examinations at issue in this case is striking: on the one hand, the mandatory annual or bi-annual examinations are scheduled by the FAA at a specific time and location, and with a doctor chosen by the FAA; on the other hand, additional medical examinations to obtain special consideration are at plaintiffs' discretion, and the time, location, and doctor are under their control.

Because the FAA does not require or control the plaintiffs' activities to obtain additional medical documentation to obtain medical waivers, those activities do not qualify as "work" under the FLSA. Therefore, there is no genuine issue of material fact as to compensation for medical examinations, and the government is entitled to judgment as a matter of law on plaintiffs' medical clearance claims.

## CONCLUSION

For the reasons stated, plaintiffs' Second Amended Complaint is deemed to be further amended to add a claim under collective bargaining agreements for compensation for medical clearance activities, plaintiffs' motion for partial summary judgment is DENIED, and the government's cross-motion for summary judgment is GRANTED. The clerk is requested to enter judgment for the government and against plaintiffs.

No costs.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge